Thomas **TREBOTICH** and Jeanne Trebotich, Appellants,

v.

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 72–1714.

United States Court of Appeals, Ninth Circuit.

Feb. 20, 1974.

---

Norman Leonard (argued), Benjamin O. Andersen of Gladstein, Leonard, Patsey & Andersen, San Francisco, Cal., for appellants.

Wesley J. Filer (argued), Scott P. Crampton, Asst. Atty. Gen., Tax Div., U. S. Dept. of Justice, Washington, D. C., Lee H. Henkel, Jr., Acting Chief Counsel, IRS, Washington, D. C., for appellee.

Before TRASK, GOODWIN, and SNEED, Circuit Judges.

## OPINION

SNEED, Circuit Judge:

In November of 1961, the Pacific Maritime Association (PMA), an organization of West Coast shipping industry employers formed for the primary purpose of negotiating and administering maritime union labor contracts, and the International Longshoremen's and Warehousemen's Union (ILWU), a labor organization representing West Coast dock workers, entered into a Memorandum of Agreement on Mechanization and Modernization in order to revise and amend provisions in existing labor contracts so as to permit the mechanization of operations throughout the West Coast shipping industry. In exchange for ILWU's consent to mechanization, the Memorandum of Agreement stipulated that PMA would establish a fund to provide certain enumerated benefits for those ILWU workers facing either a reduction in working hours or removal from the work force because of the resulting changes.

To effect the Memorandum of Agreement, PMA and ILWU also entered into a Supplemental Agreement of Mechanization and Modernization. Under the Supplemental Agreement, the employers agreed to make periodic contributions to a "mechanization fund," which was to be collected and administered by PMA. Pursuant to the scheme envisioned under the Supplemental Agreement, PMA was to transfer funds from the mechanization fund to three separate trusts established for the benefit of the dock workers: (1) a "vesting benefit trust," which was to distribute supplemental retirement benefits; (2) a "welfare trust," which was to distribute death and disability benefits; and (3) a "supplemental wage benefit trust," which was to supplement the earnings of those workers whose wages were reduced below certain minimum levels due to mech-

anization. Upon the expiration of the 1961 Supplemental Agreement in 1966, PMA and ILWU entered into an Amended Supplemental Agreement which, except for the deletion of the supplemental benefit trust and an adjustment in the aggregate employer contribution, essentially extended the scheme as initially designed.

Both the 1961 and 1966 Supplemental Agreements provided that individual employers were required to contribute to the mechanization fund in amounts based on the type and tonnage of cargo which they moved. While this allowed the actual amount of each employer's contribution to float, the annual aggregate contribution to the fund from all employers was fixed.[1] However, this fixed aggregate contribution was subject to reduction in the event that there were unauthorized work stoppages or certain other enumerated violations of the Agreement. PMA was also empowered to decrease the rate of contributions if at any time it appeared that the amount being contributed would exceed the immediate needs of the various trusts. In addition, if the total contributions which were called for under the Supplemental Agreement proved insufficient to meet the various benefit payments required under the Agreement, PMA and ILWU were authorized to decrease, defer, or eliminate any or all of those benefits.

The Supplemental Agreement envisioned that PMA would assume a dual function in administering the plan. In its relationship with the employer group, its status was designated as a "collecting agent" and as such it was given the authority to take any necessary action to compel defaulting employers to make their required contributions to the fund. In its relationship with ILWU, its status was designated as being that of a "conduit" for the transfer of funds to the respective trusts. As a "conduit," PMA

---

1. The 1961 Supplemental Agreement provided that the employers were required to contribute a total of $29,000,000 into the fund at a rate of $6,500,000 in 1961, $5,000,000 in each of the next four years, and $2,500,000 during the first six months of 1966. The 1966 Amended Supplemental Agreement increased the aggregate contribution to $38,053,308.40 and made according adjustments in the annual rate.

was authorized to use the fund for payment of payroll taxes incurred by the employers as a result of the transfers to the trusts. But the Supplemental Agreement also provided that PMA was neither to comingle contributions to the mechanization fund with any other funds under its control, nor to act as a repository for contributions beyond such time as was reasonably necessary to perform the banking and accounting functions essential to the plan's effectuation.

Under the terms of the Supplemental Agreement, neither ILWU nor the employees had any "right, title or interest, or any claim whatsoever, legal or equitable" in the mechanization fund. Nor did the trustees or trusts have any such right, title, interest or claim in the fund beyond that specifically provided by the Agreement. With respect to funds which were to be transferred from the Mechanization Fund into the vesting benefit trust, the Supplemental Agreement specifically provided that PMA

. . . shall not, in any event, transfer from the Mechanization Fund any moneys to the Trustees of the ILWU–PMA Vesting Benefit Trust, which are not required by said Trustees for immediate payment of such obligations, administration expenses or taxes which are currently due and owing by said Trustees.

. . . Upon receipt of such moneys from the Association, said Trustees shall immediately use the same for payment of such obligations, administration expenses or taxes which are currently due and owing by said Trustees.

In order to implement the above provision, the trust indenture expressly limited the power of the trustees by permitting them only to deposit the funds in a bank account until they were to be disbursed. There was no provision in the indenture authorizing them to invest any of the trust funds which they had received.

This appeal from the Tax Court raises the question of how payments made to employees from the vesting benefit trust should properly be taxed. Taxpayer, Thomas Trebotich, was a longshoreman covered by the 1966 Supplemental Agreement. Under the provisions of that Agreement, he was entitled to receive benefits totaling $13,000, less applicable payroll and withholding taxes, subject of course to the power retained by PMA and ILWU to decrease, defer or eliminate the amount of his vesting benefits. At the time of his retirement, Taxpayer applied for the benefits to which he was then entitled. He received two monthly payments of $270.84 (less payroll and withholding taxes) and then exercised his option to accelerate by applying to have the balance then due paid in a single lump sum.

On or about August 25, 1967, the trust paid over to Taxpayer the sum of $12,291.66, which he reported on his federal income tax return for that year as long-term capital gain. In so doing, Taxpayer treated the lump-sum payment as being a distribution from a trust which was qualified under Section 401(a) of the Code, 26 U.S.C. § 401(a), hence subject to capital gains treatment pursuant to Section 402(a)(2), 26 U.S.C. § 402(a)(2).[2] The Commissioner subsequently determined that the lump-sum payment was taxable as ordinary income because the vesting benefit trust failed to satisfy the requirements of Section 401(a), 26 U.S.C. § 401(a), and asserted a deficiency. On appeal to the Tax Court, the Commissioner's determination was sustained on the ground that Section 401(a), 26 U.S.C. § 401(a), implicitly required that a trust must be "funded" to be qualified, and that the vesting

2. Section 402(a)(2), as in effect for 1967, provided that if the total distributions payable to an employee from a trust which qualified under Section 401(a) were paid within one year following the employee's separation from service, such distributions were taxable as long-term capital gain. Section 402(a) has since been amended by Section 515(a)(1) of the Tax Reform Act of 1969, 83 Stat. 487, 643–644, to limit the long-term capital gain treatment of such qualified trust distributions.

benefit trust at issue here was not funded within the proper meaning of that term.

■ This appeal raises two interrelated issues. First, is whether a trust must be "funded" in order to be a "qualified trust" under Section 401(a) of the Internal Revenue Code of 1954, 26 U.S. C. § 401(a). In particular, we are asked to determine whether there must be a systematic setting aside of funds, either by the employer or the employee, during the course of employment to provide a source of payment for future benefits under a pension plan or other type of deferred compensation plan before it will be deemed "qualified." [3] Second, if such a requirement exists, we are asked to determine whether the PMA–ILWU vesting benefit trust, created and oper-

ated as an integral part of the Mechanization and Modernization Agreement, is "qualified" under Section 401(a) so that a longshoreman receiving early retirement benefits is entitled to treat the receipt of a lump-sum benefit payment as a long-term capital gain under Section 402(a)(2).

Section 401(a) establishes a series of requirements which must be met before a trust which is a part of a stock bonus, pension or profit sharing plan will be deemed qualified.[4] Although referring to the accumulation of funds in a trust, neither the literal language of the Code nor the regulations thereunder require that a qualified pension plan be funded. However, both the Commissioner's revenue rulings [5] and scholarly commentators [6] uniformly have taken the position

3. In this regard, a "funded" plan is to be distinguished from a "pay-as-you-go" type plan under which the employer agrees to pay benefits when they become due without presently setting aside funds for payment of future benefits.

4. In order for a trust to qualify under the express language of the Code, it must be a domestic trust established and maintained by the employer as a part of a stock bonus, pension or profit sharing plan for the exclusive benefit of his employees. Contributions made by the employer or his employees must be "for the purpose of distributing to such employees or their beneficiaries the corpus and income of the fund accumulated by the trust in accordance with such plan." Section 401(a)(1). The trust instrument must prohibit the trust funds from being "used for, or diverted to, purposes other than the exclusive benefit of [the] employees or their beneficiaries" at any time prior to the satisfaction of all liabilities owed employees under the plan. Section 401(a)(2). The plan itself must be so structured as not to discriminate in favor of employees who are officers, shareholders or supervisors, or in favor of other highly-compensated employees. Section 401(a)(3), (4) and (5). The plan must provide that the rights of employees which have accrued, to the extent then funded, or the amounts which have been credited to the employers' accounts must be non-forfeitable upon any termination or complete discontinuance of contributions under the plan. Section 401(a)(8). Where the plan involves trusts benefiting self-employed individuals and owner-employees, certain additional requirements not relevant here must

also be satisfied. Section 401(a)(9) and (10). See generally 26 C.F.R. § 1.401–1.

5. See Rev.Rul. 71–91, 1971–1 Cum.Bull. 116; Rev.Rul. 69–421, 1969–2 Cum.Bull. 59; Rev. Rul. 65–178, 1965–2 Cum.Bull. 94; Rev.Rul. 61–157, 1961–2 Cum.Bull. 67.

6. See, e. g. Collins, Federal Income Taxation of Employee Benefits, § 502 [9], p. 5–178; Holzman, Guide to Pension and Profit Sharing Plans 6 (1969); Montgomery's Federal Taxes 3–23 (39th ed. 1964); 2 Rabkin & Johnson, Federal Income, Gift and Estate Taxation, ch. 15.01, p. 1504 (1972); Rothman, Establishing & Administering Pension & Profit Sharing Plans & Trust Funds 107 (1967); Wood & Cerny, Tax Aspects of Deferred Compensation 234 (2d ed.); Duncan & Chaice, "Relative Merits of Funded & Unfunded Plans" in Sellin, Taxation of Deferred Employee and Executive Compensation 258 (1960).

As used in Judge Simpson's opinion below, the concept of "funding" is used to describe the accumulation of contributions in an entity beyond the employer's control prior to the payment of benefits. While such a definition is narrower than that used by some commentators, who consider any plan which contemplates prior accumulation as "funded" and designate as "advance funding" a scheme utilizing an outside entity, see Rothman, supra at 105, we have adopted Judge Simpson's approach in our analysis. Thus for purposes of this opinion, the term "funding" will refer to the advance accumulation of funds in an individual or entity independent of the employer.

that funding is a prerequisite to qualification. The issue before us is thus whether there is support in the legislative history of Section 401 to permit a judicially imposed gloss upon its proper construction.

Prior to 1921, there were no specific provisions in the revenue laws dealing with the treatment of employee pension trusts. The general rule appears to have been that employer contributions were deductible only where the employer made contributions to a pension fund which was not within his control. *See* O.D. 110, 1 Cum.Bull. 224 (1919); Art. 136 Regs. 33. Trust income was taxable under the general provisions applicable to trusts, Rev.Act of 1918, § 219, 40 Stat. 1057, 1071–1072, and the tax consequences to employee-beneficiaries were determined under the constructive receipts doctrine. *See* 4A Mertens, Law of Federal Income Taxation, § 25B.02, p. 3 (1966). With the passage of the Revenue Act of 1921, the tax consequences of distributions from stock bonus or profit sharing plans were changed to provide that such distributions would not be taxable until actually received by the employee.[7] And in 1926, this provision was expanded to include pension trusts,[8] thereby resulting in the basic provisions which have been carried into the present section 401(a)(1).

Neither the 1921 nor the 1926 Revenue Acts contained an express provision dealing with the deductibility of contributions to a pension trust. Under the general provision dealing with the deductibility of business expenses, however, the regulations did limit employer deductions to contributions made into a plan under which the employer himself did not hold the funds. *See* Section 214(a), Art. 109, Regs. 65, 69. And, in following the general thrust of the regulations, the Board of Tax Appeals denied deductions where the employer utilized a reserve account rather than making contributions into an independent trust. *See* Merrill Trust Co., 21 B.T.A. 1409 (1931); Lemuel Scarbrough, 17 B.T.A. 317 (1929).

The basic distinction between pension funds held by the employer and those placed in a qualified pension trust outside the employer's control was carried through into the Revenue Act of 1928. Employer contributions to a qualified pension trust were, by statute, made presently deductible if for present services and deductible over a ten-year period if for past services. Rev.Act of 1928, § 23(q), 45 Stat. 791, 802. A review of the legislative history underlying the above provision clearly indicates that this favorable tax treatment was intended to be accorded only where the pension funds were not held by the employer.[9]

As fully amplified in Judge Simpson's opinion below, the subsequent legislative history dealing with the tax

---

7. The Revenue Act of 1921 provided in pertinent part that the income of "[a] trust created by an employer as a part of a stock bonus or profit sharing plan . . . to which contributions are made by such employer, or employees, or both, for the purpose of distributing to such employees the earnings and principal of the fund accumulated" was not taxable until actually distributed to the employee. Rev.Act of 1921, § 219(f), 42 Stat. 227, 247.

8. Rev.Act of 1926, § 219(f), 44 Stat. 9, 33.

9. The provision allowing a deduction for contributions relating to past services was added by the Senate Finance Committee. The Senate Report accompanying the bill clearly indicates that the committee was aware that funds held by the employer were non-deductible, and that the provision was designed to allow a deduction, spread over a ten-year period, if such funds were transferred to a qualified pension trust. S.Rept.No.960, to accompany H.R. 1 (P.L. 562), 70th Cong., 1st Sess., pp. 21–22 (1928). In explicitly recognizing the existence of various forms of pension plans, the Senate Report is particularly noteworthy in its determination that favorable tax treatment was to be given only to those plans which provided that funds, were not to be held by the employer. *See* Caxton Printers, Ltd., 27 B.T.A. 1110 (1933).

treatment of qualified pension plans involved provisions designed to insure that the funds set aside for such purposes would actually benefit the employees concerned.[10] While Congress has never explicitly required that a qualified plan must be funded, it has repeatedly referred to the accumulation of principal or corpus in a trust; and the provisions relating to qualified plans appear to have been enacted on the assumption that pension funds would be accumulated, either in a trust or in an individual other than the employer, prior to payment to the employees.[11] As Judge Simpson's opinion demonstrates:

> The statutory provisions relating to qualified plans establish special and favorable tax treatment for participants in such plans. As stated by a Presidential committee, '[t]he purpose of tax concessions granted by the Federal Government to qualified pension plans is to encourage the growth of sound plans which supplement the public retirement security system.' The President's Committee on Corporate Pension Funds and Other Private Retirement and Welfare Programs, Public Policy and Private Employee Retirement Plans 50–51 (1965). The interests of the employees are furthered by having an employer set aside, while the employees are work-

ing, the funds to be distributed to them when they retire. In that manner, the employees' retirement funds are protected from the misfortunes that may occur to the employer. The diversion of funds accumulated for the retirement of employees is specifically prohibited. We cannot assume that Congress would have extended the favorable tax treatment to plans in which funds were not accumulated in an independent trust or similar manner for the benefit of employees. Thus, we think that it is fair to conclude from the legislative history that Congress expected qualified plans to be funded.

■ Viewing the vesting benefit trust in this case, whether considered alone or in conjunction with the mechanization fund held by PMA, in light of the requirement that a trust must be "funded" to qualify under Section 401(a), we have concluded that Taxpayer is not entitled to treat his early retirement benefits as capital gains. Our decision is based on the belief that the plan as structured was not intended to be, nor did it operate as a funded trust such that capital gains treatment is available under Section 402(a)(2).

While admittedly the overall plan does embody certain attributes which might suggest characterization as a funded me-

---

10. *See generally* Rev.Act of 1938, § 165(a), 52 Stat. 477, 518; H.Rept.No.1860, to accompany H.R. 9682 (P.L. 554), 75th Cong., 3d Sess., p. 46 (1938); H.Rept.No.2333, 77th Cong., 2d Sess., (1942), 1942–2 Cum. Bull. 373, 413.

11. The primary purpose behind the legislation relating to qualified plans appears to have been to prescribe the time at which employers could deduct their contributions and employees would be required to include the various forms of deferred compensation in their taxable income. Absent such provisions, employer deductions would be governed by the general requirements regarding timing of deductions, and constructive receipt principles would be applied to the realization of income by employees. With a qualified trust, the employer is assured of a deduction at the time his contributions are made and the employee is not held to have

realized income until such contributions are either distributed or made available for distribution. *Compare* Sections 404(a)(1) and 402(a) *with* Sections 402(b) and 404(a)(5). Under a non-funded plan, however, there is no issue of timing to be resolved since the time of payment and receipt is essentially the same for both the employer and the employee.

In addition, the provisions allowing capital gains treatment for certain lump-sum distributions of benefits from a qualified trust exempt under Section 501 clearly suggest a funding requirement. *See* Section 402(a)(2). The conceptual basis for such treatment— i. e., that the payment represents the distribution of funds accumulated over an extended period of time—is applicable only to a funded plan. With an unfunded plan, there is no accumulation of deferred compensation at any time prior to the actual distribution of funds to the employee.

dium, these attributes are outweighed by the elements which clearly contemplate a conduit design. As presently structured, the actual operation of the plan, regardless of the label applied, does not envision the accumulation of funds over a substantial period of time. Certain of the contractual provisions do provide for aggregate contributions in a fixed overall amount, and the fund has been insulated from direct employer control; however, a careful reading of the entire Supplemental Agreement makes it quite clear that it has been designed primarily for pass-through rather than for accumulative purposes. Such accumulation as may occur appears to be the product of error in actuarial computations concerning the projected pay-out rate, and not a part of a plan to create a *res* which would generate capital for future payments.

Under the express terms of the 1966 Supplemental Agreement, the vesting benefit trust was to receive only such funds as were immediately necessary to meet its obligations to employees, pay administrative expenses and pay taxes currently due and owing. Although it is not entirely clear as to the precise length of time the trust would hold funds under the Agreement, a complementary provision required that the trustees disburse funds from the trust "immediately" upon receipt from the mechanization fund. In addition, it is very significant that there was no provision empowering the trustees to invest funds in their possession. These provisions argue strongly that the vesting benefit trust was merely a conduit for transfer of funds from PMA to the employees covered under the Agreement. As pointed out in Judge Simpson's opinion below, it is clear that the Agreement did not contemplate that the trust would hold any substantial funds for a significant period of time and thus the arrangement does not constitute a funded trust as required under Section 401(a).

■ Nor do we feel that the employers' contractual obligation to contribute a set aggregate dollar amount to the mechanization fund, even absent the provisions for reduction of this amount in the event of unauthorized work stoppages or other violations of the PMA–ILWU Agreement, should alter the plan's characterization as being either funded or unfunded. The crucial determinant in this area is whether the employer has systematically set aside funds presently, as benefits accrue, to provide for these benefits when they become due in the future. Whether or not the employer is contractually obligated to pay pension benefits is irrelevant to our determination, in that the protections provided under the qualified trust provisions of the Code are geared, not to the employer's legal obligation to continue a plan, but to the existence of a continuing program under which funds, already contributed, are protected from direct or indirect diversion contrary to the interests of the employees. As we have indicated, the statute envisions the actual setting aside of funds in a protected trust, and not merely the existence of a promise, whether enforceable or not, to pay benefits when they become due.[12]

---

12. While a promise under seal to contribute to a pension plan can constitute a *res* of a trust, Rev.Rul. 55–640, 1955–2 Cum.Bull. 231. *Cf.* Tallman Tool & Machine Corp., 27 T.C. 372 (1956); 555 Inc., 15 T.C. 671 (1950) aff'd per curiam 192 F.2d 575 (8th Cir. 1951), a trust must have more than a *res* to be funded. While cases have held that contributions are deductible when, and only when, a trust has been found because of the existence of such a *res*, West Virginia Steel Corp., 34 T.C. 851 (1960); Tallman Tool & Machine Corp., *supra*; Abingdon Potteries, Inc., 19 T.C. 23 (1952); Crow-Burlingame Co., 15 T.C. 738 (1950) aff'd per curiam 192 F.2d 574 (8th Cir. 1951); 555 Inc., *supra*, such cases deal solely with when the trust was actually created. No issue was raised as to whether the trust qualified under Section 401. In the instant case, it seems clear that the rights of the trust under the 1966 Agreement constituted a *res* and that a trust existed; the question for determination here is whether that trust is funded so that the plan was qualified.

The issue remains, however, as to whether the mechanization fund, acting in conjunction with the vesting benefit trust, has satisfied the funding requirement for qualification under Section 401(a). A careful review of the Supplemental Agreement reveals that while the Agreement provided that PMA was to collect contributions to the mechanization fund from employers at a predetermined annual rate, which might initially suggest the accumulation of funds, the overall structure of the plan seems clearly to counter such a view of its design.

PMA's status under the Supplemental Agreement was simply that of a "collecting agent acting for and on behalf of Employers in accumulating their respective Contributions to the Mechanization Fund." While PMA was empowered to enforce each employer's obligation to make contributions, there is nothing in the Agreement to indicate that PMA was to function either independently of the employers or as a fiduciary with respect to the union or the employees. Neither the union, the employees or the trusts and their trustees had any "right, title or interest, or any claim whatsoever, legal or equitable, in or to any portion of the Mechanization Fund" until actually paid over by PMA into the trusts. The only persons with any interest in the fund were the employers, to the extent of their *pro rata* share of undistributed contributions, and PMA was authorized to reduce the rate of these contributions if funds were received at a greater rate than necessary to meet the obligations of the trusts.

Particularly when coupled with the language in the Agreement which also designated PMA as "a conduit for transferring the whole, or portions, of the Mechanization Fund received by it to the respective trusts," the provisions of the Agreement which forbid PMA to act as a repository of funds, except insofar as necessary to perform banking transactions, clearly suggest that funds were not to be accumulated in a substantial amount over any extended period of time. Indeed, if the initial actuarial computations were correct, there would be no accumulation necessary except possibly at the end of each aggregation period. PMA was to pay out funds only when the needs of the trusts required, and to reduce the rate of contribution when those requirements fell short of the rate which had been stipulated in the Agreement.[13]

■ However, even if substantial funds were accumulated by PMA, such accumulation would still not constitute the type of funding contemplated by Section 401. While under the Agreement the trust was given certain contractual rights, and it may be that under California law PMA had certain duties imposed upon it with respect to its handling of the funds, these rights and duties were insufficient to impress a trust upon the money held by PMA. Under the Agreement, PMA was an agent of

---

13. Testimony at trial also indicated that any accumulation was the result of actuarial error rather than as a part of a plan to fund future benefits.

Q. You mean to say that the agreement expired and it was renegotiated [referring to the 1965 renegotiation and Agreement]?

A. Right.

Q. Were the benefits increased at that time?

A. The benefits were increased from $8,000 approximately up to $13,000 and there was also a carryover in the funds. There was some funds that was available out of the original program because there wasn't the amount of deaths and disabilities that the actuary figured and that money was set into the new program, more or less as seed money to perpetrate the fund and take care of the liabilities of the fund until new funds would be coming in under the newly negotiated agreement.

the employers rather than a fiduciary,[14] and thus the arrangement was clearly analogous to an accumulation by the employers in a reserve account, established and controlled by them, which does not constitute the funding of a qualified plan. *See* Reginald H. Parsons, 15 T.C. 93 (1950); Claxton Printers, Ltd., 27 B.T.A. 1110 (1933); Merrill Trust Co., 21 B.T.A. 1409 (1931); Spring Canyon Coal Co., 13 B.T.A. 189 (1928) aff'd 43 F.2d 78 (10th Cir., 1930), cert. denied 284 U.S. 654, 52 S.Ct. 33, 76 L.Ed. 555 (1931).

In light of the above, we find ourselves compelled to agree with Judge Simpson's holding that:

> For their own reasons, the employers arranged to have their agent, the PMA, hold the funds until they were needed by the vesting benefit trust. The effect of the arrangement was as if the employers merely set aside the funds in a reserve account which they maintained. We cannot ignore the specific provisions of the agreement; we must conclude that in effect the funds were still held by the employers, that the funds were not transferred to the vesting benefit trust to be held by it for any substantial period of time, and that the plan was not funded as contemplated by Section 401.

Therefore, the judgment below is affirmed.

---

14. The fact that the Agreement did not give PMA the power to either invest the funds it collected, or pay any interest on funds it might hold, only bolsters the conclusion that no substantial accumulation of funds was contemplated and that PMA was not to function as other than an agent for the employers.

In addition, the Supplemental Agreement expressly provided that:

> The Association [PMA], on account of the respective Employers, may use that portion of the Mechanization Fund required for payment of such payroll taxes as the respective Employers may incur either by reason of the transfer by the Association

of their Respective Contributions to the Mechanization Fund to any of the Trusts employed to effectuate the Plan or by payment of benefits by said trusts.

This provision appears to negate the express requirements of Section 401(a)(2)—i.e., in order to qualify the trust instrument must provide that it is impossible for *any part* of the corpus or income to be diverted to purposes other than for the exclusive benefit of employees or their beneficiaries prior to the satisfaction of all liabilities with respect to such employees or their beneficiaries—which further undermines the view that the mechanization fund in conjunction with the vesting benefit trust constituted a qualified plan.