ADVANCE CONSTRUCTION COMPANY, INC., a Delaware corporation, Plaintiff,

v.

UNITED STATES of America, Defendant.

No. 72 C 247.

United States District Court, N. D. Illinois, E. D.

Dec. 15, 1972.

William L. Sharp, of Portes & Sharp, Chicago, Ill., for plaintiff.

James R. Thompson, U. S. Atty. for the Northern District of Illinois, Chicago, Ill., Scott P. Crampton, Asst. U. S. Atty., Chicago, Ill., Donald R. Anderson, Michael Von Mandel, Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

MAROVITZ, District Judge.

### I.

This is a civil action against the United States of America for the recovery of Federal Income taxes assessed and collected for the calendar year 1967. This Court has jurisdiction to hear this complaint under 28 U.S.C. § 1346(a)(1).

The basic facts leading to the dispute between the corporate taxpayer (Advance) and the Government have been stipulated to and this matter is before the Court for decision by agreement of the parties based on the stipulations, pleadings and briefs filed herein.

In December of 1962 Advance created an employees Profit Sharing Trust, which in April of 1963 was approved by the District Director as conforming to the requirements of § 401(a) of the Internal Revenue Code of 1954, 26 U.S.C. § 401(a) and was exempted under § 501(a) of the Internal Revenue Code, 26 U.S.C. § 501(a).

On December 12, 1967, the tax year here in question, the Board of Directors of Advance adopted a resolution that Advance make a contribution to the Profit Sharing Trust in the amount of $37,300.00. Fifteen percent of the eligible compensation for Advance's employees for the year 1967 amounted to $32,257.36, the $5,042.64 balance being charged against the total available contribution carryover from preceding years.

The Profit Sharing Trust dissatisfied with its previous investments was at this time seeking alternate investment avenues for its funds. Consequently when it discovered that Advance was in the process of purchasing equipment for $61,230.00 the trustees decided to lend the money as would a bank to Advance. After a down payment of $12,000.00, the Trust would lend the balance of $49,230.00 and take in return a note payable over a three-year period with interest at a 4% add-on rate and secured by a security agreement. In addition a personal guaranty by Paul I. Carson, Jr., President of Advance was requested. Rather than have the Trust liquidate assets to provide the $49,230.00 for the loan, and to avoid the circuitous route of having Advance first pay its $37,300.00 contribution to the Trust and then having the Trust pay the seller of the

equipment, it was agreed that when Advance paid the equipment seller the sum of $37,300.00 or more such payment would be treated as payment in full of the 1967 contribution of Advance to the Trust, and a simultaneous satisfaction of the Trust's obligation to pay that amount to Advance pursuant to the agreement of the Trust to lend Advance the money for the equipment.

Advance delivered to the Trustees: 1) its negotiable installment note dated December 27, 1967 in the principal sum of $49,230.00 payable to the order of the Trust in monthly installments of $1,531.-62 including principal and 4% add-on interest; 2) a security agreement with the Trust covering the equipment securing the payment of the note (this lien was paramount to all other security interests in the equipment); 3) a financing statement with respect to the loan and the security and; 4) at a later date, the personal guaranty required of Advance's President, Carson.

On January 6, 1968 Advance paid the equipment seller the sum of $48,246.00, the total value of the purchased equipment being $61,230.00. Both Advance and the Trust treated this payment as satisfaction of their respective obligations, i. e. of this $48,246.00 amount paid to the equipment seller, $37,300.00, the sum originally designated by Advance as its 1967 contribution to the Trust was considered as technically having been paid to the Trust, and the Trust was considered to have lent back that same amount to Advance. Since the total indebtedness of Advance to the Trust by virtue of its December 27, 1967 note was to be $49,230.00 and only $37,300.00 of that amount was technically "loaned" to Advance by the Trust when it permitted the $37,300.00 due it to be expended on the new equipment, the Trust delivered a check in the amount of $11,930.00 to Advance as the balance of the loan. ($37,300.00 originally designated for the Trust paid to equipment seller + $11,930.00 paid by Trust to Advance = $49,230.00, the full amount of the Trust's loan to Advance.)

The Note was paid in full and cancelled on December 3, 1970.

Advance's accountants state that as of December 31, 1967, the time these dealings were taking place, Advance had a net worth of $353,354.00 and that Paul I. Carson, the personal guarantor of the loan made by the Trust to Advance, had a net worth in excess of $600,000.00.

On October 25, 1967 Advance made a partial payment to the Trust for the 1967 year by making payment in the amount of $2,349.00 on account of the premium due on the life insurance policy issued on the life of Paul I. Carson. Defendant has conceded that this $2,349.00 sum was properly deductible. Thus the questionable deduction involved herein is not $37,300.00 but rather $34,951.00 ($37,300.00 – $2,349.00 = $34,951.00).

The refund sought is $21,395.32, $17,904.00 of tax and $3,491.32 of assessed interest, which represents the tax paid on the disallowed deduction.

The Government has counterclaimed in the amount of $89.48, the additional interest owing should it prevail in this case. (Advance paid $3,491.32 in interest.) It was initially assessed $3,-746.84 in interest of which $166.04 was abated. $3,746.84 (original interest) – $166.04 (abatement) = $3,580.80; $3,580.80 (corrected interest) – $3,491.32 (amount paid by Advance for interest) = $89.48 (counterclaim).

The substantive question we are being asked to resolve is whether the delivery by Advance, an accrual basis taxpayer, of the term promissory note with a face value of $49,230.00 secured by equipment worth $61,230.00 and personally guaranteed by the President of Advance constituted the "payment" under 26 U.S.C. § 404 to the Profit-Sharing Trust of Advance's $37,300.00 designated contribution to the Profit Sharing Trust for the year 1967.

## II.

The Internal Revenue Code of 1954, § 404, 26 U.S.C. § 404 provides:

(3) *Stock bonus and profit-sharing trusts.—*

(A) *Limits on deductible contributions.*—In the taxable year when *paid*, if the contributions are *paid* into a stock bonus or profit-sharing trust, and if such taxable year ends within or with a taxable year of the trust with respect to which the trust is exempt under section 501(a), in an amount not in excess of 15 percent of the compensation otherwise paid or accrued during the taxable year to all employees under the stock bonus or profit-sharing plan. * * *

\* \* \* \* \* \*

(6) *Taxpayers on accrual basis.*—For purposes of paragraphs (1), (2), and (3), a taxpayer on the accrual basis shall be deemed to have made a *payment* on the last day of the year of accrual if the payment is on account of such taxable year and is made not later than the time prescribed by law for filing the return for such taxable year (including extensions thereof). (Emphasis added.)

The Government contends that both the case law and the Legislative history of § 404 indicate that the words "payment" and "paid" in the aforementioned section are terms of art to be as narrowly construed as possible and would limit § 404 deductions even for accrual basis taxpayers to actual cash payments made into a pension or profit sharing fund during the taxable year for which the deduction is sought. Consequently the Government would have us find that the term promissory note delivered by Advance to the Trust in the 1967 taxable year did not constitute a contribution "paid" to the Trust in the taxable year since it was not actually paid in that year.

The Government cites various cases to the general proposition that "the ordinary and usual meaning of 'paid' is to liquidate a liability in cash." P. G. Lake, Inc. v. Commissioner, 148 F.2d 898, 900 (5th Cir. 1945); that a note does not constitute payment unless there is an accompanying "outlay of cash or property having a cash value;" Eckert v. Burnet, 283 U.S. 140, 141, 51 S.Ct. 373, 374, 75 L.Ed. 911 (1931), and that a mere "promise to pay [is] not sufficient to warrant the deduction until the promise was made good by actual payment," Helvering v. Price, 309 U.S. 409, 414, 60 S.Ct. 673, 675–676, 84 L.Ed. 836 (1939). Satisfied with its own interpretation of the cash requirements of § 404 and the insufficiency of promissory notes as payment, the Government goes on to contend that the note in our case was not an adequate substitute for cash payment since it had no cash value.

Finally the Government cites various cases decided by the Tax Court as holding that delivery of a promissory note does not constitute payment under § 404.

The Government acknowledges the fact that almost every Tax Court case cited by it in support of the contention that a promissory note does not constitute "payment" under § 404 was reversed by the Circuit Courts of Appeals but attempts to distinguish those decisions from our case. It is a strained attempt that must fail.

In view of the fact that several decisions have clearly held that promissory notes can be adequate payment under § 404 in instances similar enough though admittedly not identical to our case and considering the criteria we would use in determining what constitutes "payment" we find the Government's approach to be unsupported both by the body of authority and the reasoning we would adopt in this case.

## III.

Before we apply the various cases to the specific facts of this action some general observations regarding the definition of "payment" under § 404 are warranted.

Quite obviously the clearest most undisputed manifestation of § 404 "pay-

ment", or payment in any circumstance for that matter, is the actual delivery of cash. The transfer of cash by a company to its pension or profit sharing fund represents an immediate decrease in the former's assets and a like increase in the latter's assets in the most tangible form possible. The ultimate liquidity of cash without any further change in form or maturity presents the recipient with the widest array of conceivable alternatives regarding the disposition of the contribution. Usually the recipient will itself invest the cash in a manner that will hopefully yield increments to the fund, the cash thereby being converted into a less liquid form with a more limited negotiability which is represented by a document rather than being cash itself.

■ Understandably, an obligation need not be satisfied in cash or in a form of cash so long as there is a transfer of something that has a current "cash value". Hence there are many substitutes for cash that can be considered as "payment". What is primary is not the form of cash payment but rather cash value. Thus the more closely a cash substitute contribution under § 404 resembles the attributes of cash in its tangibility and value, the more likely it is to meet the "payment" requirements of § 404. Conversely the further removed a contribution is from currency and reality and the more intangible or non-existent the evidence of the amount contributed is, the less likely it is to qualify as a payment given its dubious if non-existent value.

The epitome of the intangible is a mere promise to pay a sum certain at a future date absent any physical evidence of that promise that in itself has a current cash value. A bare promise to pay a contribution to a profit sharing fund at a future date creates no decrease in the company's assets, no increase in the fund's assets, fails to provide the recipient with physical evidence of current cash value and consequently merely transforms one degree of intangibility, the *obligation* to pay, to another form of intangibility, a *promise* to pay.

A promise to pay can however be converted to tangibility where that promise is evidenced by an instrument such as a promissory note. In an instance such as this it is not the words of the promise that are primary but rather the physical evidence of those words. It is this reflection of the promise that takes on a self-contained, extrinsic current cash value. The degree of that current value is a function of many factors such as the duration of the note, the solvency of the obligor and the security underlying the obligation. The delivery of such a note therefore constitutes a physical transfer of something of value.

Turning now to the facts in our case it seems apparent that much of the intricate factual situation involved becomes of only secondary importance to the critical question of what Advance actually delivered to the Trust in terms of current value. If Advance, after having designated the $37,300.00 as its 1967 contribution to the Profit Sharing Trust, had simply promised to pay that amount at a future date without evidencing that obligation by anything more tangible than the promise itself, quite obviously such a transaction would not have qualified as a § 404 payment since one promise, the obligation under the Profit Sharing Trust to contribute a portion of the profits, would merely have been converted into an equally intangible promise, an obligation to pay that amount in the future. Nothing of value would have been transferred.

Similarly, if the Trust had informed Advance that it may expend the designated $37,300.00 on new equipment without first delivering that amount to the Trust and the Trust had not taken a promissory note for that amount but had merely relied on Advance's promise to repay $37,300.00 in the future the transaction would again be flawed since there would not have been a delivery to the Trust of anything of current value and the obligation to pay would merely have been converted to an intangible promise to pay in the future. Finally, even if Advance had actually *delivered*

the designated $37,300.00 in cash to the Trust and the Trust would have immediately either returned the cash to Advance or would have itself paid out the cash for Advance's equipment without taking a promissory note in return, the entire transaction would be suspect. Although in essence *delivery* would have been made, the transaction would still be questionable since Advance would again merely have converted the obligation to *pay* the Trust into the intangible promise to *repay* the Trust at a future date by simply using the Trust as a conduit to change the form of the promise. The assets of the Trust would not have been increased and it would have no physical manifestation of the obligation in terms of current value. It must be understood that any investment the Trust makes is evidenced by an instrument that is a substitute for the amount invested, a substitute which would be absent in the above stated set of facts.

What we are attempting to focus on then is that precise point in the chronology of this case where Advance's intangible obligation to contribute $37,300.00 was transformed into a physical tangible, delivery of something of current cash value.

Thus the simultaneous satisfaction by Advance's payment to the equipment seller of Advance's contribution to the Profit Sharing Trust for 1967 and the Trust's obligation under the December 27, 1967 installment note to lend Advance $49,230.00 and the various steps taken to accomplish that end merely become component requirements to lend validity to the one tangible cash value item delivered in this case—Advance's installment note secured by equipment valued at $61,230.00 and a personal guaranty by Advance's president. The primary question therefore remains not what value to attribute to the transaction as a whole but rather what cash value to assign in terms of a § 404 deduction for the 1967 taxable year to the December 27, 1967 installment note.

## IV.

As indicated earlier a mere promise to pay can be converted to cash value tangibility where an instrument such as a promissory note reflecting the promise is delivered. There are various forms of promissory notes such as demand notes which are payable on demand and term notes which specify a term over which the note must be paid.

Promissory notes fall on various points of the cash-substitute spectrum delineated earlier. Demand notes in their relationship to cash value are not unlike checks in that cash is paid for them upon request, depending however on the solvency of the obligor and the security arrangements involved. Term notes on the other hand are one step removed from demand notes in terms of their current cash value since they yield funds not by request for payment since payment is due only over a longer period of time and consequently their cash value is dependent upon the current worth of term obligations and governed by the length of the term involved. Term notes are often discounted or sold for less than face value in order to provide immediate cash, the discount or sale value of both demand and term notes being enhanced by the degree of solvency of the obligor and the strength of the security arrangements involved.

Several cases have found that payment by delivery of a note constitutes a contribution under § 404. In Sachs v. Commissioner of Internal Revenue, Slaymaker Lock Co. v. Commissioner of Internal Revenue, 208 F.2d 313 (3rd Cir., 1953) in a case similar to ours the Court stated the question of law as being:

> framed: Does a solvent, accrual-basis taxpayer "pay" a contribution to an exempt employees' pension trust by making timely delivery to the trustee of its negotiable demand note, which note is worth its face value and is later paid in cash? (at 314).

The reason the Trustees in those two cases took a note rather than cash is

similar to the reasons in our case, the desire to invest in the company and to avoid a circuitous route.

The Court went on to say that:

"payment" or "paid" does not invariably mean "in cash." If a check is sufficient, we see no reason why a negotiable demand note payable at a bank is not likewise sufficient. (at 315)

After finding no merit to the Government's argument that when Congress uses only the word "paid" it means paid in cash, an interpretation advocated by the Government in this case as well, the Court allowed the deduction for the delivery of the note for plaintiff Slaymaker.

The Court found more difficulty with plaintiff Sachs since there was some question of solvency stating:

It would be unjustified . . . to hold that there had been a "payment" when there may be serious doubt as to the value of the note. Thus, the Sachs case must go back to the Tax Court. If it should be found that the note was worth its face value, or some lesser value, the deduction should be allowed in the appropriate amount. (at 316)

■ Thus while we find that negotiable *demand* notes are sufficient payment we are also reminded that they are so because of their similarity to checks and hence to cash in terms of value.

In Wasatch Chemical Co. v. C.I.R., 313 F.2d 843 (10th Cir., 1963) however, the Court, based upon the theory that the primary question was not the form of payment but rather the value of what was delivered, found no distinction between demand notes and term notes. In *Wasatch* the taxpayer made contributions to its profit sharing plan by delivering in 1955 an unsecured promissory note in the face amount of $41,412.77 due in five years with six percent interest and for 1956 by delivering a similar note in the face amount of $36,702.93. The Court after finding that "payment" under § 404 need not be in cash and finding no merit to the Legislative in-

terpretation advocated by the Government which would permit payment only in cash, traces the evolution of promissory notes as payment in tax cases citing Anthony P. Miller, Inc. v. Comm'r, 164 F.2d 268 (3rd Cir., 1947) (demand promissory notes given by corporation to one of its officers as salary); Sachs v. Comm'r, *supra;* Time Oil Co. v. Comm'r, 258 F.2d 237 (9th Cir.) and 294 F.2d 667 (9th Cir.) (delivery of non-interest bearing demand notes); and Colorado National Bank of Denver v. Comm'r, 30 T.C. 933 (1958) (payment of contribution to pension fund by conveyance of real estate proper payment under § 404).

The Court then went on to hold:

The authorities on demand notes seem to be clear, and as mentioned, these represent situations where it had been agreed that a demand would not be made until some time from delivery had elapsed. The cases already decided have taken us far down the road on promissory notes as payment, and we feel so far indeed that there is now no return and also no basis to distinguish notes with a stated maturity from demand notes. There can be no real difference in principle, for the purposes here involved, between a demand note to be held for a time and a note having a stated maturity. If either is delivered and accepted, there is brought about *significant changes in the legal relationship of the parties.* These changes are of such a character that they constitute "payment" in the case at bar.

Some of the earlier cited cases compare demand notes to checks and then checks to cash and therefore conclude that demand notes are payment in cash. However payment in cash is not required and the authorities now clearly so hold. In the Sachs case and the Time Oil cases the concern instead was whether the notes had any value at the time of delivery, thus somewhat the same considerations were expressed as would be had there been payment in kind. The Slaymaker case

was remanded to the Tax Court for a determination of this value. Since it has been decided that payment need not be made in cash; that a demand note to be held for a time is payment; that there is no difference in principle between such a transaction and a term note, the question remaining is whether anything of value was delivered to the trustee and if so what was its value. (313 F.2d at 847)

We concur with the principle of the *Wasatch* case and find that the secured, interest bearing promissory note delivered in our case by Advance to the pension fund was a proper *form* of contribution under § 404.

This Court was originally confronted with the same problem as was the *Wasatch* Court. After having determined that "payment" had been made the Court was faced with the question of whether "anything of value was delivered to the trustee and if so what was its value", and found that the value could only be ascertained in further proceedings. (313 F.2d at 847)

Plaintiff in our case submits that "where the note in fact had a face value of $49,230.00, was secured by equipment having a fair market value of $61,230.-00, was made and delivered by a taxpayer having a net book worth of $353,-340.00, and was guaranteed by an individual who had a net worth in excess of $600,000.00, then the fair market value of the note was substantially in excess of $34,951.00." The Government disagreed.

However, subsequent to our determination that the delivery of the promissory note by Advance to the Profit Sharing Trust was a proper form of payment, a stipulation was entered into between plaintiff and the Government as to what value to assign to the note.

The stipulation reads:

On December 27, 1967, plaintiff's negotiable installment note dated December 27, 1967, in the principal sum of $49,230 payable to the order of the Advance Construction Company Employees Profit Sharing Trust in monthly installments of $1,531.60, including principal and 4% add-on interest, had a fair market value of $49,230. A true and correct copy of said note is attached to the complaint as Exhibit B.

The disallowance by the Internal Revenue Service having been improper, it is ordered that plaintiff have judgment against defendant for the principal amount of $21,395.32, the amount of overpaid taxes, with interest thereon at six percent according to law.