HARRY E. LANSING and JEAN A. LANSING, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Lansing v. Commissioner
Docket No. 752-74
United States Tax Court
T.C. Memo 1976-313; 1976 Tax Ct. Memo LEXIS 91; 35 T.C.M. (CCH) 1421; T.C.M. (RIA) 760313; October 5, 1976, Filed Harry E. Lansing and Jean A. Lansing, pro se. Peter M. Ritteman and Virginia M. Tomasulo, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent has determined deficiencies in the petitioners' Federal income tax as follows: Year
Amount
1968
$ 2,681.09
1969
12,706.68
1970
8,096.04
Due to concessions by the parties, the following issues remain for decision: 1. Whether the pension trust created pursuant to section 401(a)[1] by petitioners' wholly-owned Subchapter S corporation has sufficient economic reality to be recognized for tax purposes. 2. Whether petitioners incurred interest expense in the amounts of $2,080 and $1,000 in 1969 and 1970, respectively. 3. Whether petitioners have adequately substantiated travel expenses; and 4. Whether expenses incurred in 1969 and 1970 in connection with an automobile owned by the corporation are deductible in excess of the amount allowed *94 by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners, Harry E. Lansing and Jean A. Lansing, husband and wife, resided in East Lansing, Michigan, at the time the petition was filed in this case. Petitioners filed joint Federal income tax returns for the years in issue with the district director of internal revenue at Cincinnati, Ohio. Petitioners owned and operated a music store under the name of Campus Music Shop near Michigan State University. In 1964 petitioners began publishing and selling college course outlines for the use of the University students. Eventually, petitioners prepared, published and sold 50 different outlines. In order to facilitate preparation, publication and sale of the outlines petitioners in 1965 organized a corporation under the laws of the state of Michigan known as Beagle Enterprises, Inc., (Beagle or the corporation). Beagle issued 500 shares of capital stock to each petitioner. At all times during the corporation's existence, [2] petitioners were the sole stockholders and the sole employees. Harry E. Lansing was the corporation's president and Jean A. Lansing was the secretary-treasurer. *95 On April 1, 1965 Beagle elected to be treated as a small business corporation for income tax purposes. In 1966 Beagle executed a trust agreement creating the Beagle Enterprises, Inc. Employees Pension Trust (the Trust) and designating petitioners as trustees. Petitioners as trustees were notified on December 14, 1966, that the Trust was a qualified trust under section 401(a) and exempt from income tax under section 501. On March 29, 1972, the exemption of the Trust was revoked retroactively as of the date of the initial favorable qualification. The trust agreement directed the trustees to use the funds of the Trust for contracts on the lives of the participants and also to make deposits into an auxiliary fund. Under the agreement the auxiliary fund was to be used to purchase "additional" annuities at retirement to provide (when added to the basic annuity purchased on behalf of the employee during his working years) the retirement benefits provided for by the plan. A terminated employee was provided "a fully vested interest in each contract issued and in effect for his benefit" but it was specifically *96 provided that "in no event shall such terminated Participant have any vested interest in the Auxiliary Fund." No contributions were required from the employees. Annuity contracts were purchased from Equitable Life Assurance Society of America, (Equitable). Premium payments on the annuity contracts were made to Equitable as follows: 1966
by trust
$7,189.89
1967
by employer
1,270.16
1968
by employer
7,189.89
1969
by trust
4,945.70
In 1970 the Trustees cancelled the annuity contracts and the Trust received the cash surrender value of $9,778.69. After the cancellation of the annuity contracts, which resulted in a loss of $10,816.95, the auxiliary fund was the only funding medium of the Trust and an actuary was engaged to determine the amounts required to be paid into the Trust. The Trust also contained the following provisions relating to the investments, management, and accounting of the funds of the Trust: 15.3 * * * The Trustees are further authorized and empowered to invest any and all funds in the Auxiliary Fund in any manner as an ordinary prudent investor which is acceptable to the Internal Revenue Service for the investment of qualified *97 pension trust funds, or to enter into the Auxiliary Fund agreement with the issuing insurance company for the placing of such funds at interest with the insurer. * * *
15.8 The Trustees shall keep minutes of their proceedings and complete records of the administration of the Trust, which minutes and records may be examined at any reasonable time on behalf of the Employer by any officer or employee (not necessarily as defined in Article II) designated in writing by the Employer. The Trustees shall make available to the Participants, Retired Participants and Terminated Participants and to their Beneficiaries, for examination at any reasonable time, such records as pertain to the person examining. 15.9 Within 90 days following the close of the fiscal year of the Trust, the Trustees shall furnish the Employer a written statement of account and the Employer shall promptly notify the Trustees in writing of its approval or disapproval thereof. Failure by the Employer to disapprove within 90 days after receipt of any such statement shall be considered an approval thereof. The approval by the Employer of any statement of account shall be binding, as to all matters embraced in *98 the statement, on all parties to this agreement and on all Participants, Retired Participants, and Terminated Participants, to the same extent as if the account of the Trustees had been settled by judgment or decree in an action for a judicial settlement of their accounts in a court of competent jurisdiction in which the Trustees, the Employer and all persons having or claiming any interest in the trust fund were parties; provided, however, that nothing herein contained shall deprive the Trustees of their right to have their accounts judicially settled if they so desire. 15.10 The Trustees shall use ordinary care and reasonable diligence in the exercise of their powers and the performance of their duties hereunder. * * *
18.4 It is understood that no part of the corpus of income hereunder shall ever be used or diverted to purposes other than for the exclusive benefit for participants, Retired Participants, and Terminated Participants, or their Beneficiaries. A checking account was maintained in the First National Bank of East Lansing (First National) in the name of "Beagle Enterprises, Inc., Employees Pension Trust, Harry and Jean Lansing." Additionally, a savings account *99 was maintained at East Lansing Savings and Loan Association (the Savings and Loan) under the name "Beagle Enterprises, Inc. Employees Pension Fund." Funds of Beagle and the Trust were extensively commingled in the savings account of the Trust from which large withdrawals were made on several occasions of funds allegedly belonging to Beagle. However, the statements of the savings account do not specifically identify the funds belonging to Beagle, funds that represent current contributions to the Trust by Beagle, or funds belonging to the Trust from previous contributions. Beagle maintained no financial records of its own, and such financial records pertaining to Beagle that are available are incorporated in the financial journal of Campus Music Shop. These financial records contain no information concerning the deductions Beagle, Inc., claimed for contributions to the Trust. Substantiation of the deductions rests primarily on efforts to correlate entries in the statements of the savings account with third party payments by Beagle and a series of notes and unrecorded mortgages underlying the following bewildering series of transactions. Petitioners in their individual capacity *100 purchased a lot in Whitehills Estate (the Whitehills lot) in East Lansing for $13,500. Checks dated December 29, 1966 and December 30, 1966 in the amounts of $2,000 and $1,500, respectively, were drawn to the order of Whitehills Development Company (Development Company) on account of the Trust in partial payment for the Whitehills lot. In 1966, petitioners also paid $7,000 to the Development Company that they had borrowed from the Trust, bringing the total payments in 1966 to $10,500. During 1967 the Trust paid an additional $3,000 to the Development Company for the Whitehills lot, paying off the $13,500 that petitioners paid for their lot. On March 15, 1967, petitioners executed a mortgage (described therein as a "temporary indenture") on the Whitehills lot to the trust to secure repayment at 7 percent in 1 year or on demand of the $10,500 advanced in 1966.[3] The mortgage was not recorded. Subsequently, a warranty deed dated May 11, 1967 was executed by the Development Company conveying the Whitehills lot to petitioners. The deed was recorded on May 22, 1967. A promissory note dated March 15, 1968, was at some point in time executed by petitioners to the Trust for $13,500 *101 which incorporated the $10,500 withdrawal in 1966 and the $3,000 advance from the Trust in 1967. In 1968 petitioner commenced construction of a building for use as a personal residence and as an office for Beagle on the Whitehills lot. A number of direct or indirect withdrawals of funds ostensibly belonging to the Trust were made in order to complete construction of the Whitehall property, represented by the following: August 9, 1968
$ 650
December 16, 1968
6,000 [4]
March 12, 1969
5,700 [5]
April 9, 1969
13,300 [5], [6]
May 10, 1969
11,500 [6], [7]
August 5, 1969
300 [6], [7]
March 24, 1970
11,000 [6]
*102 Petitioners executed a contract to sell their residence on Hagadorn Road (the Hagadorn property) to John Shrank for $27,500 on September 15, 1969. Five thousand dollars was paid at the time the contract was signed and the balance with interest was payable in installments of $200 each. Petitioners were to convey the title to the Hagadorn property only upon performance of the purchaser's covenants. The Shrank land contract was not recorded. At the time of the Shrank contract petitioners had an unpaid balance on a loan from the Savings and Loan secured by a first mortgage on the Hagadorn Road property. For a consideration of $22,500 petitioners executed and assigned a second mortgage on the Hagadorn Road property to the Trust on September 15, 1969. Neither the second mortgage nor the assignment of mortgage was recorded. The Shrank contract was also assigned to the Trust pursuant to an undated instrument executed by petitioners. On March 15, 1970, petitioners executed a promissory note in the amount of $30,353 with 7 percent interest to the Trust. This note was secured by a second mortgage on the Whitehills lot. The second mortgage was not recorded. The first mortgage on *103 the Whitehills lot was held by First National to secure repayment of $60,000 and was recorded on June 23, 1969. The second mortgage to the Trust which secured cured the $30,353 note was superseded by a second mortgage executed on March 15, 1971, to secure repayment of $43,977.71 at 7 percent interest. This mortgage was also not recorded. In 1973 petitioners sold the Whitehills property to F. Jerome and Judith A. Corr. A promissory note dated October 24, 1973, was executed by the Corrs to the petitioners in the amount of $76,484.82 at 8 percent interest. This note was secured by a second mortgage.The Corr note and mortgage were assigned to the Trust by petitioners on November 20, 1973. The assignment was recorded on January 2, 1974. Beagle wrote a series of checks on its corporate account during 1969 and 1970 for goods supplied and services rendered in the construction and furnishing of their residence in the Whitehills Estates. At some point in time notes were executed from petitioners to the Trust reflecting their theory that these involved constructive payments of deductible pension fund contributions by Beagle to the Trust and miscellaneous loans to petitioners. In March *104 1968 petitioners expended $717.88 on a trip to Florida. Petitioners also made a trip to New York City in September 1968 for which $514.95 was expended. The expenses incurred in connection with the New York City trip included $100 for expenses of petitioners' daughter who was a member of the board of directors of Beagle. No business appointments were scheduled prior to the trips. Petitioners owned an automobile which was not used for business purposes. Beagle also owned an automobile which was used for various business purposes.In addition, the Beagle car provided transportation for petitioners from their residence to the Campus Music Shop. On occasion, petitioners would use the Beagle car to transport outlines which were produced at their residence to the shop. Although petitioners deducted all expenses related to the Beagle car, respondent allowed only 75 percent of the amount claimed as business related. OPINION The primary issue for decision in this case is whether the Trust had sufficient economic reality to be recognized under the tax law. [8] The trust was established in conjunction with a pension plan which initially received approval as a qualified plan under section *105 401(a). Respondent contends that the petitioners, who were the sole shareholders and officers of the creator corporation as well as the sole beneficiaries and trustees of the Trust, dealt with the Trust res in a manner which deprived the Trust of any economic reality for Federal tax purposes.Consequently, respondent concludes that since no Trust cognizable under the tax laws was created, Beagle, the creator of the alleged Trust, is not entitled to any deductions for contributions pursuant to the plan. [9] We agree with respondent. *106 The Federal tax consequences we confront do not depend on the paper edifice erected, but on whether that edifice corresponds with economic reality--whether there has been a substantial change in economic ownership. Burde v. Commissioner,352 F. 2d 995 (2nd Cir. 1965), affg. 43 T.C. 252 (1964); Irvine K. Furman,45 T.C. 360 (1966), affd. per curiam 381 F. 2d 22 (5th Cir. 1967). We believe that the petitioners, when all the circumstances of this case are considered in context, should be treated as the owners of the trust property, and that for Federal tax purposes the Trust, having no economic reality, was a nullity. [10]
*107 Where the management, ownership and control of several related entities is in the hands of one person, the Courts carefully scrutinize the relationship of the various entities to ensure that the substance of the transactions--measured by the actual conduct of the parties--accords with the form in which they are cast. We are not here confronted with a case where, although the employees, shareholders, officers, trustees, and beneficiaries are identical, the activities peculiar to each capacity can be isolated and have been conducted in accordance with the duties imposed on the specific role. In the instant case, petitioners' activities could not be segregated as to the various roles. For instance, we cannot discern at which points petitioners acted as trustees, as officers of the creator corporation, as employees, or as beneficiaries of the Trust. Petitioners freely and consistently dealt with the "trust" property as their own and as a matter of economic reality, there was no separation of legal title from beneficial enjoyment.[11]
*108 Petitioners' enjoyment of the Trust property was not delayed until retirement as contemplated by the pension plan. Instead, the Trust res was used for their immediate personal benefit both as officers of the creator corporation and as individuals. Petitioners drew checks on the Trust checking account to purchase a lot in their individual capacity. Petitioners used Trust funds to pay costs for the construction of a combined personal residence and office. On other occasions petitioners used corporate funds to construct their personal residence, contending that those funds, or at least some portion of them, were contributions to the Trust and loans to the beneficiary. [12]
*109 If secured, these "loans" were secured by junior unrecorded mortgages. Petitioners did assign one note and a second mortgage securing the note to the Trust and did record the assignment in 1974, 2 years after the qualification of the plan and Trust was revoked. Petitioners rely on Rev. Rul. 65-178, 1965-2 C.B. 94, 124 as modified by Rev. Rul. 67-288, 1967-2 C.B. 151 as authorizing the alleged loans. Even if the Trust had any economic reality, the loans to petitioners as participants in the plan would not have been within the scope of respondent's rulings. Together those rulings permit loans from a pension trust to participants in excess of their vested interests but only if the loans are adequately secured, bear a reasonable rate of interest, and are repaid within a specified period of time. The loans in this case were evidenced for the most part by unsecured promissory notes executed at some point in time. Additionally, the notes required repayment within specified periods but were not actually repaid in cash when due. Rather, new notes were executed bearing the same interest rate. In addition, funds of the Trust and the creator corporation were *110 commingled in the Trust savings account. Although petitioners contend that they could identify ownership of the amounts deposited to and withdrawn from the Trust savings account, no books reflecting Trust receipts or expenditures were maintained nor did the corporation keep a record of required contributions. [13]
*111 At one point petitioners conceded no separate records were kept by Beagle, Inc., and that "the contributions to the auxiliary fund we kept track of by those notes,". At another point petitioners, again conceding lack of contributions records by Beagle, Inc., stated that Beagle's records of contributions were the corporate income tax returns themselves. As concerns the Trust records, petitioners conceded that the Trust "didn't have a journal as such" [14] and stated that the amounts "to be put in the fund each year can be checked from the 990-P's." These explanations were offered when petitioners' attempts to recall past events from the savings account statements of the Trust proved clearly futile. [15] Petitioners simply regarded the Trust fund money as their own, stating at one point that "We were the only ones involved at either end * * *". For this reason they dealt with Trust fund money as their own property, and never exercised any fiduciary responsibilities with regard to the trust corpus. Based on the entire record, we hold that the Trust lacked economic reality and was a nullity for tax purposes. *112 Several secondary issues remain for our consideration. The first is whether petitioners incurred interest expense in the amounts of $2080 and $1000 in 1969 and 1970, respectively. The 1969 interest claim is composed in part of 7 percent interest on a note in the amount of $13,500 executed by petitioners to the Trust in 1968. [16] The remaining amount for 1969 and the entire amount claimed in 1970 is attributable to payments on a land contract assigned to the Trust in conjunction with a mortgage executed by petitioners. Since we have determined that the Trust lacked economic reality for Federal income tax purposes, petitioners could not pay any amounts to the Trust. If any interest was paid, it was paid to the corporation. However, petitioners have failed to prove that any interest was paid. Petitioners rely solely on the records of deposit to the Trust savings account to prove that interest was paid on an existing indebtedness. Although the records clearly indicate that deposits were made *113 to the account, it is impossible for us to determine what amounts, if any, constituted repayments on loans and the amount of interest thereon as contrasted to payments from Beagle. Consequently, petitioners are not entitled to deduct any amounts as interest. Petitioners also claim a deduction for traveling expenses under section 162. Petitioners contend that the trip to Florida was motivated by a desire to expand the outline publishing business and that the trip to New York was designed to establish buying agreements directly with manufacturers. In addition, petitioners contend that a board of directors meeting was held during the course of their New York trip. Section 162 provides a deduction for ordinary and necessary business expenses including traveling expenses while away from home on business. The taxpayer must prove that the expenditure was related primarily to business rather than personal reasons. Vaughn v. Chapman,48 T.C. 358 (1967); James Schulz,16 T.C. 401 (1951). Moreover, to qualify for a deduction for traveling expenses, the taxpayer *114 must also fulfill the stringent substantiation requirements of section 274. Section 274 requires that the amount, time and place, and business purpose of the expenditure be proved by adequate record or by evidence corroborating the taxpayer's own statement. With respect to travel, the amount to be proven is the amount of each separate expenditure except that the daily costs may be aggregated in reasonable categories. Section 1.274-5(b)(2)(i), Income Tax Regs. The time requirement contemplates evidence of departure and return dates as well as number of days away from home spent on business. Section 1.274-5(b)(2)(ii), Income Tax Regs.
The parties have stipulated that petitioners expended $717.88 and $514.95 on travel to Florida and New York City, respectively. However, no evidence was presented to identify either individual expenditures or aggregate expenditures (such as meals, lodging and transportation) included in those amounts. No evidence regarding specific departure or return dates was presented. Moreover, the only evidence regarding the business nature of the trips was the vague and uncorroborated testimony of petitioner *115 Harry E. Lansing. That testimony consisted of general statements that petitioners met with various manufacturers but Harry Lansing failed to identify any particular persons or business meetings. Additionally, the testimony alluded to a board of directors meeting but neither testimony regarding the substance of the meeting nor any supporting documentary evidence was produced. Petitioners have thus failed to fulfill any of the substantiation requirements of section 274. Consequently, they are not entitled to a deduction for travel expenses in excess of that allowed by respondent. The final issue remaining for our decision is whether expenses incurred in connection with a corporate car are fully deductible. Operating expenses of automobiles used in a business are clearly deductible under section 162. Section 1.162-1(a), Income Tax Regs. However, as with all deductions for business expenses, petitioners must prove that the expenditure was primarily business related. Vaughn V. Chapman,supra; James Schulz,supra.
Although the *116 corporately-owned automobile was used primarily in the business, it was not exclusively so used. Petitioners admittedly used the car to commute from their home to the business. Since commuting expenses are not deductible, expenses incurred in connection with the corporate car which were attributable to commuter use are not deductible. Section 1.162-2(e), Income Tax Regs.
Petitioners have failed to produce evidence that commuting and personal use of the car accounted for less than 25 percent of the expenses. Consequently, we sustain respondent's determination that only 75 percent of the operating expenses of the corporate car is deductible. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954 unless otherwise indicated.↩
2. Beagle filed a certificate of dissolution effective January 31, 1972.↩
3. A note for the amount of $10,500 bearing the same date was also executed at some point in time.↩
4. A note bearing no interest was executed to reflect an obligation to repay the Trust. ↩
5. These amounts were paid by cashier's checks drawn to the order of Steve Rushing who had furnished services and materials for the construction of the building on the Whitehills lot. ↩
6. Notes were at some point in time executed by petitioners to reflect an obligation to repay amounts withdrawn at 7 percent interest. ↩
7. These amounts were received as checks drawn to and endorsed by Beagle Enterprises, Inc., but notes were at some point in time executed by petitioners in their individual capacity to reflect an obligation to repay the amounts so advanced.↩
8. The deficiency notice disallowed the deductions for contributions to the Trust on the grounds that the amounts were not actually paid to the Trust. Additionally, the deficiency notice increased petitioners' taxable income by amounts they withdrew from the Trust during the years in issue. At trial, respondent based his case on a broader theory, that is that the Trust lacked economic reality, and this issue was tried by consent of the parties. See Rule 41(b), Tax Court Rules of Practice and Procedure.↩ Thus, if we determine that the Trust lacked economic reality, we need not determine whether the contributions were actually paid nor whether the withdrawals were loans or distributions. In that event no deduction would be allowed for the contributions but the amounts withdrawn would not be taxable as distributions.
9. Respondent does not contend that if a trust existed, the transactions here in issue constituted prohibited transactions under section 503. Section 503(b) does not include trust beneficiaries within the class of persons and organizations with whom the specific transactions are prohibited.Moreover, the statute provides that if a qualified trust has engaged in prohibited transactions, it will be denied exemption but only for years subsequent to the year in which it is notified of the prohibited transactions. Section 503(a)(2).↩
10. We do not reach the question of whether a valid Trust was created under applicable state law, although as we previously said under similar circumstances, "the evidence is less than overwhelming." Irvine K. Furman,45 T.C. 360, 364 (1966), affirmed per curiam, 381 F. 2d 22 (5th Cir. 1967). A trust is defined as "a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." 1 Restatement, Trusts 2d, sec. 2, p. 6 (1959). Thus, the essence of a trust is a separation of legal title from beneficial enjoyment of the trust property. Equitable Trust Co. v. Milton Realty Co.,261 Mich. 571, 246 N.W. 500 (1933); Bogert, Trusts, sec. 17 (2d ed.) (1965); 1 Scott, Trusts, sec. 2.6. (3d ed. 1967), Consequently, one of the primary duties imposed on the trustee is to keep the trust property separate from his own property and from other property not subject to the trust.Bogert, supra, sec. 596; 1 Restatement, supra, sec. 179. We entertain reservations as to the validity of the Trust. But in any event, the mere execution of the Trust agreement, regardless of its status under state law, is not determinative for Federal tax purposes where, as in the situation before us, the Trust is wholly without economic reality. Irvine K. Furman,supra.↩
11. In order for a pension plan to meet the requirements of a qualified plan under section 401, it must be funded. Funding entails the accumulation of funds in a person independent of the employer. Thomas Trebotich,57 T.C. 326 (1971), affd. 492 F. 2d 1018↩ (9th Cir. 1974).
12. Petitioners allege that the transactions by which the corporation paid construction costs on their homes had the same effect as a contribution to the Trust by the corporation and a subsequent loan from the Trust to the employee-participants. Petitioners further contend that the decision in Advance Construction Company, Inc. v. United States,356 F. Supp. 1267 (N.D. Ill., 1972) validated these transactions. In Advance Construction,supra, a corporation voted to contribute $37,300 to a profit-sharing trust. The trust, seeking new investments, learned that the corporation intended to borrow money to purchase new equipment and offered to loan the corporation $49,230. The corporation accepted but paid the equipment seller for the equipment. The trust then delivered a check for $11,930. The corporation treated the remaining $37,300 paid to the seller as the contribution to the trust and delivered a negotiable installment note in the amount of $49,230 to the trust. The note, which was secured by a first lien on the equipment, provided a definite repayment schedule, and was repaid within three years. The court held that these transactions were equivalent to a payment in cash for purposes of section 404. The facts in Advance Construction,supra,↩ are clearly distinguishable from the instant case. Here, the employees rather than the corporation "borrowed" the money. Thus, it was not a merely circuitous route by which the corporation and the trust would net out their respective obligations. (The transactions also reinforce the conclusion that petitioners in whatever capacity had unrestricted use of the trust property). In addition, in the instant case, the corporate contribution to the Trust was determined by the amounts incurred in construction costs rather than by a more objective standard. In some cases notes were not executed until months after the money was made available (and in other cases we do not know when the notes were executed). Additionally, to the extent security was provided, it consisted essentially of unrecorded second mortgages. Finally, petitioners did not repay the unsecured loan in cash but executed a new note.
13. Although a payment in the year for which the deduction is claimed is generally required to sustain a deduction for contributions to a pension plan, sec. 404(a)(6) treats payments by accrual basis taxpayers as made on the last day of the year of accrual if made not later than the time prescribed for filing the return for the taxable year. Thus, the absence of any evidence of accrual of the contributions by Beagle during the years for which the deductions are claimed combined with the lack of records for the Trust would be fatal to a deduction in excess of the amount actually paid during the year. In addition, the commingling of funds of Beagle and the Trust prevents a determination of the actual contributions.Moreover, delivery of a promissory note does not constitute payment within the meaning of sec. 404(a)(6). Don E. Williams Co. v. Commissioner,527 F. 2d 649 (7th Cir. 1975), affg. 62 T.C. 166 (1974), cert. granted 426 U.S. (June 7, 1976). Thus, even if the corporation had properly accrued the contributions, the delivery of unsecured promissory notes reflecting those accruals would be inadequate to satisfy the payment requirement of sec. 404(a)(6)↩.
14. We note that the Trust Agreement required "minutes of * * * proceedings and complete records of the Administration" (Art. 15.8), and annual "written statement of account" by the Trustees, among other safeguards. The Trustees proceeded as though these and other safeguards did not exist. ↩
15. For example, petitioners contend that all withdrawals from the savings account of the Trust from August 9, 1968 through March 12, 1969, were of commingled funds belonging to the corporation.Yet when $6,000 was withdrawn on December 16, 1968, petitioners executed a non-interest-bearing note to the Trust for $6,000. They now claim to have discovered this was a mistake and the $6,000 belonged to Beagle, Inc., all along, but no convincing explanation is provided as to which theory is correct (if indeed either one adequately explains what happened).↩
16. The $13,500 note superseded a $10,000 note executed in 1967.The interest apparently includes 7 percent interest for one year on $10,000 plus 7 percent for one year on $13,500.↩