Ernest Lee **HOLLINGSHEAD, Jr.,**
et al., Plaintiffs,

v.

**BURFORD EQUIPMENT COMPANY, et al., Defendants and Third–Party Plaintiffs,**

v.

**Kenneth G. PARMER,**
**Third–Party Defendant.**

Charles K. **CALLIHAN, et al.,**
Plaintiffs,

v.

**BURFORD EQUIPMENT COMPANY, et al., Defendants and Third–Party Plaintiffs,**

v.

**Kenneth G. PARMER,**
**Third–Party Defendant.**

Civ. A. Nos. 88–D–461–N, 89–D–179–N.

United States District Court,
M.D. Alabama, N.D.

Oct. 15, 1990.

---

E.J. Saad, Crosby, Saad & Beebe, Mobile, Ala., Jay F. Guin, Tanner, Guin, Ely, Lary & Neiswender, P.C., Tuscaloosa, Ala., for plaintiffs and third-party defendant Kenneth G. Parmer.

Robert G. Tate, A. Brand Walton, Burr & Forman, Birmingham, Ala., for Burford Equip. Co., Burford, Inc., and Lamar Burford.

Richard A. Ball, Jr., Ball, Ball, Matthews & Novak, P.A., Montgomery, Ala., L. Traywick Duffie, Daniel G. Calugar, Kurt A. Powell, Hansell & Post, Atlanta, Ga., for defendants and third-party plaintiffs.

## MEMORANDUM OPINION

DUBINA, District Judge.

This cause is before the court on cross motions for summary judgment filed by the parties.

The plaintiffs (hereinafter sometimes referred to collectively as "the Burford employees") filed motions for partial summary judgment on January 17, 1989, and April 23, 1990. They filed memorandum briefs in support thereof on January 18, 1989, February 14, 1989, and June 28, 1990. The defendants, Burford Equipment Company; Burford, Inc.; and J. Lamar Burford, Jr.

(hereinafter sometimes collectively referred to as "Burford"), filed memorandum briefs in opposition to the Burford employees' motions on January 30, 1989, February 14, 1989, and June 18, 1990.

The third-party defendant, Kenneth G. Parmer ("Parmer"), filed a motion to dismiss and a motion for summary judgment on April 23, 1990, together with a memorandum brief in support thereof. Burford filed a memorandum brief in opposition thereto on June 18, 1990.

Burford filed a motion for partial summary judgment on July 3, 1990. It filed a memorandum brief in support thereof on July 9, 1990, and the Burford employees filed a memorandum brief in opposition to Burford's motion on July 17, 1990.

The parties have also submitted numerous letter briefs to the court. In addition, the court heard oral arguments from the parties on July 26, 1990.

## I. BACKGROUND

In 1934, J. Lamar Burford, Sr., together with other incorporators, established Burford–Toothaker Tractor Company. The company's name was changed to Burford Equipment Company ("Burford Equipment") in 1962. In 1985, it became a wholly owned subsidiary of Burford, Inc. On April 26, 1987, Burford Equipment sold its assets to Thompson Tractor & Equipment Company, Inc. ("Thompson Tractor"). Burford Equipment has not, however, been dissolved.

Burford, Inc., was incorporated in 1985, and owns 100% of the outstanding stock of Burford Equipment.

J. Lamar Burford, Jr. ("Lamar Burford"), owns 100% of the voting stock of Burford, Inc. He is president and chairman of the board of both corporate defendants.

Burford Equipment provided certain fringe benefits for its employees. These benefits included a profit-sharing plan to which the company made discretionary contributions and to which employees could also contribute if they chose. Any funds due to employees from the profit-sharing plan were paid upon their retirement, either in an annuity format or a lump sum payment. The terms of the profit-sharing plan were fully set out in a written document, and the plan was qualified with the Internal Revenue Service ("IRS").

Burford Equipment payroll records also indicate that pension benefits to retired persons have been among the fringe benefits provided for many years. These retirement benefits were paid on a monthly basis to the recipients and were in addition to any funds due from the profit-sharing plan. Pension benefits were paid on an informal basis beginning in the 1950's. Burford Equipment had no written documentation of any retirement policy, however, until 1977, when the minutes of the board of directors' meeting of January 25, 1977, reflected the following:

> Mr. Burford brought up the fact that we have no formal retirement policy, but that we need to establish some guidelines. He suggested the following:
>
> –To be eligible, an employee would have to be 62 years of age.
>
> –Employees with 15 to 20 years service would be guaranteed 40% of their preceding year's salary with the exception of salesmen. Salesmen will be guaranteed 40% based on an average of their previous five years income. Their Social Security payment to be a part of the 40%.
>
> –Employees with 20 to 25 years service would be given 50%; and, employees with 25 years and over service would be given 60%.
>
> Mike Hutson made a motion to adopt the retirement guidelines as presented. Barney Beaird seconded the motion. Motion carried.

The company amended the 1977 resolution in 1978, when the minutes of the board of directors' meeting of January 17, 1978, reflected the following:

> Bill Canter brought up the need to amend the company guidelines for employee retirement to cover "Unusual Circumstances". It was suggested that if the Board of Directors approved it as

beneficial to the company, a [sic] employee would be eligible for a special retirement if he or she were 55 years of age. Mike Hutson made a motion to adopt the proposed amendment as presented. Barney Beaird seconded the motion. Motion carried.

The foregoing corporate resolutions constitute the only written formulations of the terms of the retirement policy that existed at Burford Equipment. After their adoption, but prior to Burford Equipment's selling its assets, numerous employees attained retirement age, retired from their employment, and received pension benefits consistently thereafter. After the sale of assets to Thompson Tractor, however, no other employees received retirement benefits pursuant to this policy.

At issue in this lawsuit is the latter retirement policy. Burford claims that it was a voluntary, gratuitous service award program for key employees under which neither corporation has any obligation to make further payments, although Burford, Inc., is presently continuing to pay benefits to those employees who retired before the sale of Burford Equipment's assets to Thompson Tractor. The Burford employees contend that Burford Equipment had established a retirement plan under which they are entitled to receive all benefits either promised to them by the company or guaranteed to them by the Employee Retirement Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA"). In order to distinguish the disputed retirement plan from the profit-sharing plan, this court will hereinafter refer to the plan at issue as "the service retirement plan."

All of the Burford employees seek to enforce the terms of the service retirement plan pursuant to ERISA. The Hollingshead plaintiffs are former employees of Burford Equipment or the spouses of former employees who were denied retirement benefits pursuant to the service retirement plan after the asset sale. The Callihan plaintiffs are participants or the spouses of participants in the service retirement plan who retired prior to the asset sale and are currently receiving benefits pursuant to

the plan. They are also requesting class certification to represent all persons (with the exception of the Hollingshead plaintiffs) who have a vested accrued benefit in the plan, whether or not the benefit is being paid, and the spouses of those persons who would be entitled to receive a survivor annuity.

Parmer is one of the Hollingshead plaintiffs, and was formerly on the board of directors of Burford Equipment.

## II. THE STANDARD FOR GRANTING SUMMARY JUDGMENT

Rule 56(c), *Fed.R.Civ.P.*, provides that a summary judgment may be granted only:

if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Accordingly, when considering a motion for summary judgment, the court must refrain from deciding any material factual issues. Instead, the court's sole function on a motion for summary judgment is to determine whether there exist issues of material fact to be tried and, if not, whether the moving party is entitled to a judgment as a matter of law. *See Dominick v. Dixie Nat'l Life Ins. Co.*, 809 F.2d 1559 (11th Cir.1987); *Tippens v. Celotex Corp.*, 805 F.2d 949 (11th Cir.1986); *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406 (5th Cir.1980). Moreover, in performing this function, inferences which are drawn from the underlying facts must be viewed in the light most favorable to the party opposing summary judgment. In other words, all doubt as to the existence of a genuine issue of material fact must be resolved against the party moving for summary judgment. *See United States v. Diebold, Inc.*, 369 U.S. 654, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962); *Tippens*, 805 F.2d at 954; *Carlin Communication, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352 (11th Cir.1986).

As to the burden of proof on a motion for summary judgment, the movant clearly

bears the exacting burden of showing both that there is no actual dispute as to any material fact and that the moving party is entitled to a judgment as a matter of law. *See Combs v. King*, 764 F.2d 818 (11th Cir.1985). In clarifying the proper allocation of this burden, the United States Supreme Court recently stated as follows:

> [W]e are convinced that the inquiry involved in a ruling on a motion for summary judgment or for a directed verdict necessarily implicates the substantive evidentiary standard of proof that would apply at the trial on the merits. If the defendant in a run-of-the-mill civil case moves for summary judgment or for a directed verdict based on the lack of proof of a material fact, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff. The judge's inquiry, therefore, unavoidably asks whether reasonable jurors could find by a preponderance of the evidence that the plaintiff is entitled to a verdict—"whether there is [evidence] upon which a jury [could] properly proceed to find a verdict for the party producing it, upon whom the *onus* of proof is imposed."
>
> \* \* \* \* \* \*
>
> Thus, in ruling on a motion for summary judgment, the judge must view the evidence presented through the prism of the substantive evidentiary burden.... The question ... is whether a jury could reasonably find *either* that the plaintiff proved his case by the quality and quantity of evidence required by the governing law *or* that he did not.
>
> \* \* \* \* \* \*
>
> Our holding, [however,] ... does not denigrate the role of the jury. It by no means authorizes trial on affidavits.

Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor. Neither do we suggest that the trial courts should act other than with caution in granting summary judgment or that the trial court may not deny summary judgment in a case where there is reason to believe that the better course would be to proceed to a full trial.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 254–55, 106 S.Ct. 2505, 2512, 2513–14, 91 L.Ed.2d 202 (1986) (citations omitted). *See also Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### III. DISCUSSION

Historically, pension plans and other fringe benefit programs for American employees have not always been well-managed. Congress enacted ERISA in 1974 in an attempt to establish stability and prevent loss, thereby providing comprehensive federal regulation of all plans which provide fringe benefits to employees. ERISA is a remedial statute designed to protect the interests of employees by guarding against abuse in the administration of such benefit plans, and to protect employers from conflicting and inconsistent state regulation of such plans. The former is accomplished by the establishment of uniform standards for reporting, disclosure, and fiduciary responsibility for all types of plans; the latter the preemption of all state laws relative to employer benefit plans. *Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983); *Donovan v. Dillingham*, 688 F.2d 1367 (11th Cir.1982) (en banc).

The United States Supreme Court discussed the policy goals of ERISA in *Nach-*

*man Corp. v. Pension Benefit Guar. Corp.,* 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980).

One of Congress' central purposes in enacting this complex legislation was to prevent the "great personal tragedy" suffered by employees whose vested benefits are not paid when pension plans are terminated. Congress found "that owing to the inadequacy of current minimum standards, the soundness and stability of plans with respect to adequate funds to pay promised benefits may be endangered; that owing to the termination of plans before requisite funds have been accumulated, employees and their beneficiaries have been deprived of anticipated benefits." ERISA § 2(a), 88 Stat. 832, 29 U.S.C. § 1001(a). Congress wanted to correct this condition by making sure that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it.

446 U.S. at 374–75, 100 S.Ct. at 1732–33 (footnotes omitted). *Accord Shaw,* 463 U.S. at 90, 103 S.Ct. at 2896; *Nachwalter v. Christie,* 805 F.2d 956, 959–60 (11th Cir. 1986). ERISA assures plan participants that they will obtain the benefits to which they are entitled and that they will not lose those benefits as a result of unduly restrictive provisions or lack of sufficient funds. *Helms v. Monsanto Co.,* 728 F.2d 1416, 1420 (11th Cir.1984).

With the overall purpose of ERISA in mind, this court will discuss the following issues presented by the pending motions for summary judgment.

A. Is the service retirement plan a "benefit plan" as defined by ERISA?

■ Burford contends that the Burford employees have not presented sufficient evidence to demonstrate the establishment of a benefit plan as defined by ERISA. It argues that the decision to pay retirement benefits pursuant to the service retirement plan to any particular employee was discretionary with Lamar Burford; that the guidelines adopted by the board of directors were not always followed; and that none of the company publications mentioned the service retirement plan.

ERISA applies to "any employee benefit plan if it is established or maintained by any employer engaged in commerce or in any industry or activity affecting commerce...." 29 U.S.C. § 1003(a)(1). The general term "employee benefit plan" is defined to cover an "employee welfare benefit plan," an "employee pension benefit plan," or a plan which includes both. 29 U.S.C. § 1002(3). This court will hereafter confine its attention to "pension plans" under ERISA as they relate to the instant case.

Title 29 U.S.C. § 1002(2)(A) defines an "employee pension benefit plan" and a "pension plan" as follows:

[A]ny plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—

(i) provides retirement income to employees, or

(ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,

regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan.

ERISA requires that a "plan, fund, or program" be "established or maintained" by an employer. Although ERISA does not contain exact definitions for these terms, the United States Court of Appeals for the Eleventh Circuit explored their meaning in *Donovan.*[1]

Commentators and courts define "plan, fund, or program" by synonym—ar-

1. The court notes that the Eleventh Circuit in

*Donovan v. Dillingham,* 688 F.2d 1367 (11th

rangement, scheme, unitary scheme, program of action, method of putting into effect an intention or proposal, design—but do not specify the prerequisites of a "plan, fund, or program." At a minimum, however, a "plan, fund, or program" under ERISA implies the existence of intended benefits, intended beneficiaries, a source of financing, and a procedure to apply for and collect benefits.

\* \* \* \* \* \*

The Secretary contends that "establish" means no more than an ultimate decision by an employer or an employee organization to provide the type of benefits described in ERISA.... This sweeps too broadly. A decision to extend benefits is not the establishment of a plan or program. Acts or events that record, exemplify or implement the decision will be direct or circumstantial evidence that the decision has become reality—e.g., financing or arranging to finance or fund the intended benefits, establishing a procedure for disbursing benefits, assuring employees that the plan or program exists—but *it is the reality of a plan, fund, or program and not the decision to extend certain benefits that is determinative.*

In determining whether a plan, fund or program (pursuant to a writing or not) is a reality a court must determine whether from the surrounding circumstances a reasonable person could ascertain the intended benefits, beneficiaries, source of financing, and procedures for receiving benefits. Some essentials of a plan, fund, or program can be adopted, explicitly or implicitly, from sources outside the plan, fund, or program ... but no single act in itself necessarily constitutes the establishment of the plan, fund, or program.

*Donovan,* 688 F.2d at 1372–73 (emphasis added).

Cir.1982) (en banc) discusses employee welfare benefit plans, but this court is of the opinion that the Eleventh Circuit's discussion of the

This court is of the opinion that the service retirement plan is a pension plan as defined by ERISA. This court had no difficulty ascertaining from the record that the intended benefits were monthly pensions after retirement; the beneficiaries were the employees of Burford Equipment; the source of financing was the general assets of Burford Equipment; and the procedures for receiving benefits were written notice by the employee to his or her supervisor, calculation of the benefit due by a company official pursuant to the guidelines set out in the corporate minutes, approval by Lamar Burford, and notification of the payroll department.

The terms "established or maintained" are not easy to define, but the courts are quite clear on what is not involved in the establishment of a plan. No formal, written plan is required. *Donovan,* 688 F.2d at 1372; *see also Scott v. Gulf Oil Corp.,* 754 F.2d 1499, 1503 (9th Cir.1985). ERISA's reporting and fiduciary provisions are not prerequisites for the coverage of a plan, but simply apprise administrators and fiduciaries of their responsibilities under a plan. The purpose of ERISA is the protection of the employee, so it cannot follow that noncompliance with requirements imposed on employers or fiduciaries can provide an escape hatch from ERISA coverage. The definitive requirement is the reality of the provision of specified benefits, regardless of whether the plan is formal or informal, written or unwritten. *Scott,* 754 F.2d at 1503–04; *Donovan,* 688 F.2d at 1373. In light of the reality of the provision of pension benefits by Burford Equipment to numerous employees, this court is of the opinion that the service retirement plan was established or maintained by Burford, and is, therefore, subject to enforcement pursuant to ERISA.

Burford also argues that the exception under ERISA for gratuitous payments to "pre-Act retirees" is applicable to the Burford service retirement plan. 29 C.F.R. § 2510.3–2(e) states that the term "pension

terms "plan, fund, or program" and "established or maintained" is equally applicable to employee pension benefit plans.

plan" does not include voluntary, gratuitous payments to former employees by an employer if the following criteria are met.

(1) Payments are made out of the general assets of the employer,

(2) Former employees separated from the service of the employer prior to September 2, 1974,

(3) Payments made to such employees commenced prior to September 2, 1974, and

(4) Each former employee receiving such payments is notified annually that the payments are gratuitous and do not constitute a pension plan.

Although the record reflects that some pension benefits are paid by Burford to employees who retired before September 2, 1974, there is no evidence that Burford has ever complied with the notice provisions of 29 C.F.R. § 2510.3–2(e)(4). In the opinion of this court, the service retirement plan is not exempt from ERISA coverage on this basis.

B. Is the service retirement plan a "top-hat plan" which is exempt from certain ERISA provisions?

 Parts 2, 3, and 4 of Title I of ERISA do not apply to "a plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." *See* 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). Such plans are often referred to as "top-hat" plans. Top-hat plans are exempt from ERISA's minimum participation, vesting, and funding standards, benefit accrual and joint and survivor annuity requirements, and fiduciary responsibility regulations.

Burford contends that the service retirement plan is a top-hat plan because it was designed to reward "key" employees and primarily benefitted employees receiving salaries on the high side of the salary spectrum. Notwithstanding this characterization, Lamar Burford's deposition testimony reflects the following:

Q You are not saying that you have to be an executive to receive any of this post-employment compensation, are you?

A No.

Q In fact, you don't have to be highly paid; right?

A Correct.

Q You are not saying that this plan is somehow exempt because it only deals with a certain class of employees?

MR. DUFFY: Objection to form.

A That's correct.

Deposition of Lamar Burford, October 24, 1988, at 94–95 (hereinafter referred to as "Burford Deposition").

Q Has that retirement plan or service award policy—however you wish to denominate it—ever been limited to any single class of employees?

A It would be limited to what we might consider key employees in each class of employees.

Q Has it ever been limited to highly paid or highly compensated managerial employees?

A Not limited to just those, no.

Q In fact, it covers the entire spectrum of janitors to vice-presidents, doesn't it?

A Key people, all the whole class of— all the classes of our company.

Q So you might pay retirement benefits to a key janitor but turn down a vice-president?

A That could be entirely possible.

\* \* \* \* \* \*

Q I am not sure I understand what you mean by key positions. What do you mean by key positions?

A Key people.

Q How do you determine a person is key?

A Well, as we discussed before lunch, time of service, contribution to the company, loyalty.

Burford Deposition at 147–48.

ERISA Opinion 90–14A, recently released by the Department of Labor, explains the rationale behind the top-hat exemption as follows:

It is the view of the Department that in providing relief for "top-hat" plans from

the broad remedial provisions of ERISA, Congress recognized that certain individuals, by virtue of their position or compensation level, have the ability to affect or substantially influence, through negotiation or otherwise, the design and operation of their deferred compensation plan, taking into consideration any risks attendant thereto, and, therefore, would not need the substantive rights and protections of Title I.

ERISA Opinion 90–14A at 2. The opinion then states as follows:

It also is the Department's position that the term "primarily", as used in the phrase "primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees" ... refers to the purpose of the plan (i.e., the benefits provided) and not the participant composition of the plan. Therefore, a plan which extends coverage beyond "a select group of management or highly compensated employees" would not constitute a "top-hat" plan for purposes of Parts 2, 3 and 4 of Title I of ERISA.

ERISA Opinion 90–14A at 2 n. 1.

In light of Lamar Burford's testimony that all Burford employees were eligible for consideration under the service retirement plan, this court is of the opinion that the plan extended coverage beyond a select group of highly compensated employees, and is not, therefore, a top-hat plan which would be exempt from any ERISA provisions.

C. Are the Burford employees' claims barred by ERISA's statute of limitations?

■ Burford argues that the Burford employees cannot be granted summary judgment as to its statute of limitations defense because some, if not all, of them were on notice as far back as the 1970's that the service retirement plan was not being maintained in compliance with ERISA. Burford bases this argument on the fact that no summary plan descriptions or annual reports were distributed to the Burford employees regarding the service

retirement plan, but were distributed regarding the profit-sharing plan. Therefore, Burford reasons, the employees had reason to know breaches of fiduciary responsibility had occurred. The Burford employees contend that their cause of action did not accrue until April of 1987, when Burford denied the claims for benefits of all employees who had not retired prior to the asset sale to Thompson Tractor.

Title 29 U.S.C. § 1113 creates a statute of limitations for claims for the breach of fiduciary duties under ERISA. This statute states:

(a) No action may be commenced under this title with respect to a fiduciary's breach of any responsibility, duty, or obligation under this part, or with respect to a violation of this part, after the earlier of—

(1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission, the latest date on which the fiduciary could have cured the breach or violation, or

(2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation;

except that in the case of fraud or concealment, such action may be commenced not later than six years after the date of discovery of such breach or violation. (Footnotes omitted.)

The Eleventh Circuit discussed the time bars contained in § 1113 as follows:

The six-year time period reflects Congress' determination to impress upon those vested with the control of pension funds the importance of the trust they hold. Thus, Congress evidently did not desire that those who violate that trust could easily find refuge in a time bar. Congress did, however, create two exceptions to the six-year limitation period. The first is the three-year limitations period mentioned above, which begins to run when the Secretary acquires "actual knowledge" of an ERISA violation. *See* 29 U.S.C. § 1113(a)(2)(A) (1982). Only the second exception, which is not rele-

vant to our case, incorporates the theory of constructive knowledge. That section is triggered when the Secretary "could reasonably be expected to have obtained knowledge of [the alleged] breach or violation" from a filed report. *Id.*, § 1113(a)(2)(B). As in the case of actual knowledge, in this situation the Secretary must sue within three years. To charge the Secretary with actual knowledge of an ERISA violation, it is not enough that he had notice that something was awry; he must have had *specific knowledge of the actual breach of duty upon which he sues.*

*Brock v. Nellis,* 809 F.2d 753, 754–55 (11th Cir.1987) (emphasis added).

This court is of the opinion that the mere failure of Burford to provide written summaries of the service retirement plan to the Burford employees does not provide them with the actual knowledge of the breach of fiduciary duties upon which they sue. It was not until their claims for benefits were denied that they had the specific knowledge that triggers the running of § 1113's time bar.

Furthermore, the statute of limitations contained in § 1113 only pertains to claims for breach of fiduciary duties. The Burford employees' other ERISA claims were brought pursuant to the civil enforcement provisions of ERISA, 29 U.S.C. § 1132. Section 1132(a) grants a participant in or a beneficiary of a pension plan the right to bring a civil action to recover benefits and to enforce or clarify his or her rights under the terms of the plan. Neither § 1132 nor the substantive portions of ERISA upon which the majority of the Burford employees' claims are based provide an explicit limitations period for bringing a private cause of action. In such a case, this court must look to state law for an analogous statute of limitations. *See Dameron v. Sinai Hosp. of Baltimore, Inc.,* 815 F.2d 975 (4th Cir.1987); *Dameron v. Sinai Hosp. of Baltimore, Inc.,* 595 F.Supp. 1404 (D.Md.1984).

Non-fiduciary ERISA claims seeking recovery of pension benefits and clarification of rights under a pension plan have been characterized as contract claims. *Dameron,* 815 F.2d at 981; *Jenkins v. Local 705 Int'l Bhd. of Teamsters Pension Plan,* 713 F.2d 247, 252 (7th Cir.1983). Alabama law provides a six-year statute of limitations for contract actions. *See* Ala.Code § 6–2–34 (1975).

An ERISA cause of action accrues when an application for benefits is denied. *Dameron,* 595 F.Supp. at 1413. The Burford employees had six years, therefore, from the date on which their benefits were denied to bring their non-fiduciary claims. Clearly, their complaints are not barred by any applicable statute of limitations.

**D. What is the normal retirement age under the service retirement plan?**

■ The corporate resolution passed by Burford Equipment's board of directors in 1977 stated that employees must be 62 years old to be eligible for the service retirement plan. The 1978 corporate resolution amended the "guidelines for employee retirement" to make employees eligible for retirement at age 55 under "unusual circumstances" with the approval of the board of directors. Lamar Burford testified in his deposition about the meaning of "unusual circumstances" as follows:

Q ... What unusual circumstances was the company facing in 1978? Any at all that you are aware of or was that just for planning purposes?

A No. This was, as I mentioned, unusual circumstances, being employee illness.

Q Time marching by?

A Time marching by and those things.

Q Okay. And he makes the suggestion that if the Board of Directors approves it is [sic] beneficial to the company. Did you all approve this plan as being beneficial to the company by your vote?

A I don't know.

Q The second motion carried?

A Yes.

\* \* \* \* \* \*

Q So thereafter the special retirement, whether you call it the Burford retire-

ment plan or the service award policy, could be obtained by an employee at age fifty-five?

A Under unusual circumstances.

Q Is there any definition for unusual circumstances?

A Just as I gave you: Health, time passing by.

Burford Deposition at 161–62.

The Burford employees contend that in actuality, the normal retirement age under the service retirement plan was age 55. In the alternative, they contend that the service retirement plan provided an early retirement option beginning at age 55 which cannot now be modified. Of the 51 employees who retired from Burford Equipment, nine did so before the age of 62. The Burford employees state that retirement benefits were not denied to anyone who requested retirement before age 62, and Burford does not refute that statement. The deposition testimony of former employees indicates a general understanding among the Burford employees that anyone who had 15 years of service could retire beginning at age 55. Parmer explained as follows:

Q Could you tell me about that conversation [with Mike Hutson in 1982 regarding retirement benefits]?

A He called me into his office. I am not sure if this was specifically about this, about retirement, but it led into retirement and he told me that I would be retired when I was fifty-five years old.

Q That you would be retired?

A When I reached the age of fifty-five with sixty percent of my salary to apply.

And there was another conversation after that of the exact same nature and that took place in 1984.

Q Who was that with?

A Mike Hutson.

Q What did he say then?

A Basically, as far as I remember, the same conversation and the same promise that he made in 1982.

Q Let's go back to the 1982 conversation. Do you recall how that conversation began?

A I remember some of the conversation and that being that there were younger folks coming into the organization and that I would be retired on time at age fifty-five with sixty percent of my salary.

Deposition of Kenneth G. Parmer at 25–26. Don Groves, another plaintiff in this case, stated as follows:

Q What was your understanding about the terms of the retirement program? You've talked about a formula a couple of times. What else involved besides the formula? Anything?

A Well, yes. When you reach the age of 55, you could retire. That much, I know. I mean—

Q When you reach the age of what?

A At age 55, that you could retire as early as age 55.

Q Where do you get that?

A That was told to my [sic] by Mr. Canter. And then I had Mr. Reader indicate that to me.

\* \* \* \* \* \*

Q What was your understanding of the age 55 limitation? Was that—I mean, could anybody retire at age 55?

A That was my understanding.

Q Anybody could?

A That's correct. If they had the number of years' service, they could.

Deposition of Donald J. Groves at 22–23.

This court is of the opinion that normal retirement age under the service retirement plan was 62, but is also of the opinion that the 1978 corporate resolution created an optional early retirement benefit beginning at age 55. Despite Burford's contention that retirement before the age of 62 was conditioned upon the existence of unusual circumstances and approval of the board of directors, the facts presented to this court indicate that the company's practice was to allow retirement at age 55 or after to any employee who requested it.

Further support for the Burford employees' position on this issue is provided by the

summary description of Burford's profit-sharing plan, a written document which was provided to the employees in accordance with ERISA. The paragraph in that document entitled "Retirement Age" states:

> Normal retirement age will be the December 31 next following the 65th birthday. With the written consent of the company an employee may continue to be employed beyond normal retirement age and in the event of such continued employment the employee will continue to participate in the plan until actual retirement. An employee who has participated in the plan for ten (10) years or more and who has attained the age of fifty-five may retire before reaching the normal retirement age.

The Burford employees reason that since they received documentation relative to the profit-sharing plan which indicated that employees who wished to do so would be allowed to retire at 55, they were justified in understanding that they could take early retirement under the service retirement plan at 55 as well. In the opinion of this court, their reasoning is persuasive, especially in light of Burford's actual practice in this regard.

■ This court is further of the opinion that the service retirement plan cannot now be modified to eliminate the early retirement option without being violative of 29 U.S.C. § 1054(g), which provides:

> (1) The accrued benefit of a participant under a plan may not be decreased by an amendment of the plan, other than an amendment described in section 1082(c)(8) or 1441 of this title.
>
> (2) For purposes of paragraph (1), a plan amendment which has the effect of—

(A) eliminating or reducing an early retirement benefit or a retirement-type subsidy (as defined in regulations), or
(B) eliminating an optional form of benefit,
with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits....

■ Burford argues that early retirement benefits have not accrued for any of the Burford employees who had not retired prior to the asset sale because the board of directors has not approved any early retirements since then, nor does it plan to approve any. This court does not agree. The exercise of an employer's discretion in awarding benefits has been limited by the IRS since January 1, 1989. Treas.Reg. § 1.411(d)–4 Q & A–4 [2] states:

> [A] plan that permits the employer, either directly or indirectly, through the exercise of discretion, to deny a participant a section 411(d)(6) protected benefit provided under the plan for which the participant is otherwise eligible (but for the employer's exercise of discretion) violates the requirements of section 411(d)(6). A plan provision that makes a section 411(d)(6) protected benefit available only to those employees as the employer may designate is within the scope of this prohibition. Thus, for example, a plan provision under which only employees who are designated by the employer are eligible to receive a subsidized early retirement benefit constitutes an impermissible provision under section 411(d)(6).

The foregoing regulation interprets § 1054(g) to mean that a plan provision which gives an employer the discretion to decide which participants receive early retirement benefits is violative of public policy. This section became effective for existing noncollectively bargained plans on "the

---

**2.** I.R.C. § 411(d)(6) is essentially identical to 29 U.S.C. § 1054(g) [ERISA § 204(g) ]. The Treasury Regulations interpreting I.R.C. § 411 also apply to ERISA. Treas.Dec. 8212 states:

The regulations under section 411 are also applicable to provisions of Title I. Thus, these requirements also apply to employee plans subject to Title I of ERISA. Under section 101 of Reorganization Plan No. 4 of 1978 [43 FR 47713], the Secretary of the Trea-

sury has jurisdiction over the subject matter addressed in these regulations. Therefore, under section 104 of the Reorganization Plan, these regulations apply when the Secretary of Labor exercises authority under Title I of ERISA.

Treas.Dec. 8212, CCH Pension Plan Guide [December 1987—July 1989 Transfer Binder 23,-748C at 25,169–96].

first day of the first plan year commencing on or after January 1, 1989." Treas.Reg. § 1.411(d)-4 Q & A-9(b)(2). Transitional rules permitted a limited exception to § 1054(g) to allow existing plans to amend optional benefits to either make them available to all participants without limitation or to apply objective and nondiscriminatory conditions to their availability. Treas.Reg. § 1.411(d)-4 Q & A-8(b). Any such amendment must have been made to the Burford plan by January 1, 1989. Treas.Reg. § 1.411(d)-4 Q & A-8(d). No such amendment was ever made by Burford.

Burford also argues that the only exception to this rule, found in Q & A-8(c)(2), applies to it. Under certain circumstances, plan amendments may be adopted on a later date "within the time period permitted for amending plans in order to meet the requirements of section 410(b) as amended by TRA '86." Burford then argues that it has until January 1, 1991, to amend its plan. The exception is not applicable to Burford for two reasons. First, an operational compliance requirement is imposed by Q & A-8(c)(1), pursuant to which Burford was required to select one of the alternatives permitted under Q & A-8(b) and operate the plan in accordance therewith. Burford contends that it chose to eliminate the optional early retirement benefit. In the opinion of this court, Burford made no such selection. Its failure to pay any benefits to anyone after the asset sale is not regarded by this court as a selection of an operational alternative. Second, an extension of time is allowed in order for a plan to meet the requirements of I.R.C. § 410(b), which deals with plan qualification for tax purposes. The service retirement plan is not qualified, and Burford has argued strenuously that plan qualification is not required in its case. Absent a decision on Burford's part to seek tax qualification at this juncture, a contingency that is not likely, Q & A-8(c)(2) is not applicable to the service retirement plan.

E. Does ERISA require Burford to obtain IRS qualification of the service retirement plan?

■ ERISA contains no express provision that requires an employer to qualify a pension plan under the Internal Revenue Code. Instead, the tax consequences of not qualifying are so severe that practical considerations generally force employers to qualify their plans. If a plan is not qualified, the employer cannot take deductions for contributions made to the plan until the benefits become funded and vested in the employees. I.R.C. § 404(a)(5). The employees must pay income tax on the benefits as soon as they become funded and vested. I.R.C. § 402(b). On the other hand, if a plan is qualified, the employer may deduct its contributions as they are made, and the employees are not required to include the benefits in their taxable income until they are actually received in cash. I.R.C. § 404(a)(1); I.R.C. § 402(a).

The law in this area is governed largely by I.R.C. § 83, which provides that payments into a trust which funds pension benefits only become deductible as benefits become vested. At the same time they become deductible to the employer, they become includable in the income of the employee. Because Burford did not ever establish a trust to fund the Burford retirement plan, however, the parties received the favorable tax treatment they would have had if the plan had been qualified. I.R.C. § 402(b); Treas.Reg. § 1.83-3(e). In essence, Burford enjoyed favorable tax treatment in the absence of a qualified retirement plan as a result of its violation of the funding standards of ERISA. The Burford employees argue that unless this court requires Burford to qualify any funded plan it is ordered to establish as a result of this lawsuit, all benefits will be immediately taxable to them, resulting in inequitable tax consequences. The Burford employees also suggest that as an alternative to qualification of the plan, this court should require Burford to pay damages sufficient to compensate the employees for the punitive tax results they will suffer if the plan is not qualified.

Burford contends that nothing in ERISA requires that a retirement plan be qualified for federal income tax purposes. This court must agree.

The legislative history of ERISA speaks to the qualification issue as follows:

A fundamental aspect of present law ... is reliance on voluntary action by employers (and employees under contributory plans) for the establishment of qualified retirement plans. The committee bill also continues the approach in present law of encouraging the establishment of retirement plans which contain socially desirable provisions through the granting of tax inducements. In other words, under the new legislation as under the present law, no one is compelled to establish a retirement plan. However, if a retirement plan is to qualify for the favorable tax treatment, it will be required to comply with specified new requirements which are designed to improve the retirement system. Since the favorable tax treatment is quite substantial, presently involving a revenue loss of over $4 billion a year, it is anticipated that plans will have a strong inducement to comply with the new qualification rules and thereby become more effective in fulfilling their objective of providing retirement income.

H.R.Rep. No. 93–807, 93rd Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 4677.

This court's research has revealed no cases in which this particular issue has been litigated. Some guidance is provided, however, in *DeLaFuente v. United States*, 586 F.Supp. 526 (E.D.N.Y.1984). The plaintiff in *DeLaFuente* received a lump sum payment of severance benefits from an unqualified benefit plan, all of which was required to be included in his ordinary income at the time of its receipt. He argued, as do the Burford employees, that although his employer never set up a trust fund, its failure to do so should not deprive him of the favorable tax treatment to which he would have otherwise been entitled had his employer acted in accordance with the law. *DeLaFuente* differs from the instant case in that ERISA does not require an employer to fund potential severance pay liabilities, unlike the affirmative funding requirement imposed on pension plans. The *DeLaFuente* court's reasoning does not take that distinction into account. Instead, relying on two pre-ERISA cases, the district court opined as follows:

The issue here is whether plaintiff can get favorable tax treatment on a lump-sum payment made to him by the Post not out of any trust fund. We think not. The fact that the Post might have been under a duty to set aside funds for severance pay is immaterial since in actuality no such funds were set aside under § 401(a)(1).

This decision is reaffirmed by *Trebotich v. Commissioner*, 492 F.2d 1018 (9th Cir. 1974) (pre-ERISA), where the employer was under a contractual duty to make contributions to a mechanization fund, but failed to do so. Taxpayer received a lump-sum payment, as retirement benefits, and sought favorable tax treatment which was denied by the district court on the ground that the payment did not come from a funded, qualified trust. The Court of Appeals affirmed, stating

The crucial determinant in this area is whether the employer has systematically set aside funds presently, as benefits accrue, to provide for these benefits when they become due in the future. Whether or not the employer is contractually obligated to pay pension benefits is irrelevant to our determination, in that the protections provided under the qualified trust provisions of the Code are geared, not to the employer's legal obligation to continue a plan, but to the existence of a continuing program under which funds, already contributed, are protected from direct or indirect diversion contrary to the interests of the employee. As we have indicated, the statute [§ 401(a)] envisions the actual setting aside of funds in a protected trust, and not merely the existence of a promise, whether enforceable or not, to pay benefits when they become due.

*Id.* at 1025. *See Myron v. United States*, 382 F.Supp. 590 (C.D.Cal.1974) (also pre-ERISA), *aff'd*, 550 F.2d 1145 (9th Cir.1977), holding that where the employer could have made payments for

employees who should have been covered by the plan, but did not do so, the plan was not qualified and retroactive payments could not cure the deficiency and thereby qualify the plan.

*DeLaFuente*, 586 F.Supp. at 528.

This court is of the opinion that there is nothing in ERISA that mandates qualification of a pension plan for income tax purposes. Even though an inequitable result occurs in the instant case, the United States Supreme Court has been reluctant to imply meaning into ERISA provisions that Congress did not expressly put there. *See Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985). Furthermore, in light of the reasoning expressed in *DeLaFuente*, this court is doubtful that Burford could qualify its pension plan after the fact. A basic requirement of a § 401(a) qualified pension plan is the existence of a trust fund, and it is undisputed in the instant case that no resources were set aside by Burford to fund the service retirement plan.

Alternatively, the Burford employees argue that this court should require Burford to pay damages sufficient to compensate them for the adverse tax consequences that they will suffer. ERISA does allow a court to exercise discretion in fashioning a remedy for plan violations, but in the opinion of this court, the Supreme Court's opinion in *Massachusetts Mutual* indicates that the statute primarily envisions "plan-related" remedies rather than compensation for individual beneficiaries. 473 U.S. at 142, 105 S.Ct. at 3090. Since ERISA does not require qualification of a pension plan as a matter of law, even though favorable tax consequences were undoubtedly anticipated by Congress, they are not mandatory and cannot be guaranteed by judicial intervention.

F. Does ERISA prohibit Burford from maintaining both a tax qualified profit-sharing plan integrated with Social Security and a non-qualified pension plan which uses a Social Security offset?

The concepts of vested and nonforfeitable rights are critical to the statutory scheme promulgated by Congress in ERISA. ERISA establishes that "[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age." 29 U.S.C. § 1053(a). ERISA defines a nonforfeitable pension benefit or right as "a claim obtained by a participant or his beneficiary to that part of an immediate or deferred benefit under a pension plan which arises from the participant's service, which is unconditional, and which is legally enforceable against the plan." 29 U.S.C. § 1002(19). The United States Supreme Court interpreted that definition in *Nachman Corp. v. Pension Benefit Guar. Corp.* as follows:

[T]he principal subject of the definition is the word "claim"; it is the claim to the benefit, rather than the benefit itself, that must be "unconditional" and "legally enforceable against the plan." ...

\* \* \* \* \* \*

[T]he term "forfeiture" normally connotes a total loss in consequence of some event rather than a limit on the value of a person's rights.... It is therefore surely consistent with the statutory definition of "nonforfeitable" to view it as describing the quality of the participant's right to a pension rather than a limit on the amount he may collect.

446 U.S. at 371–73, 100 S.Ct. at 1731–32 (footnotes omitted).

Integration of pension benefits with other resources available to retired employees is clearly permitted by the Internal Revenue Code. Integration is also permitted under ERISA, even though it technically violates the nonforfeiture provisions. The Supreme Court discussed the applicability of this practice to ERISA in *Alessi v. Raybestos–Manhattan, Inc.*, 451 U.S. 504, 101 S.Ct. 1895, 68 L.Ed.2d 402 (1981).

It is particularly pertinent for our purposes that Congress did not prohibit "integration," a calculation practice under which benefit levels are determined by combining pension funds with other income streams available to the retired employees. Through integration, each in-

come stream contributes for calculation purposes to the total benefit pool to be distributed to all the retired employees, even if the nonpension funds are available only to a subgroup of the employees. The pension funds are thus integrated with the funds from other income maintenance programs, such as Social Security, and the pension benefit level is determined on the basis of the entire pool of funds. Under this practice, an individual employee's eligibility for Social Security would advantage all participants in his private pension plan, for the addition of his anticipated Social Security payments to the total benefit pool would permit a higher average pension payout for each participant. The employees as a group profit from that higher pension level, although an individual employee may reach that level by a combination of payments from the pension fund and payments from the other income maintenance source. In addition, integration allows the employer to attain the selected pension level by drawing on the other resources, which, like Social Security, also depend on employer contributions. Following its extensive study of private pension plans before the adoption of ERISA, Congress expressly preserved the option of pension fund integration with benefits available under both the Social Security Act ... and the Railroad Retirement Act of 1974....

451 U.S. at 514, 101 S.Ct. at 1901-02. The Burford employees recognize that integration of Social Security benefits with pension benefits is not in and of itself violative of ERISA's nonforfeiture provisions, but they do argue that the extent of Burford's integration with Social Security in both the profit-sharing and service retirement plans constitutes an impermissible forfeiture of benefits.

■ Burford contends initially that the rules and regulations regarding integration of Social Security with retirement plan benefits found in the Internal Revenue Code are exceptions to the nondiscrimination requirements for tax qualification, and have no application to the vesting and nonforfeiture requirements found in ERISA. Although Burford is correct that the nondiscrimination requirements have no statutory parallel in ERISA, Burford's argument would disallow integration itself. If Congress implicitly allowed integration of benefits with other income sources in retirement plans subject to ERISA, then it is only logical that the rules and regulations governing integration for tax purposes would also apply for ERISA purposes.

In *Alessi,* the Supreme Court applied Revenue Rulings concerning the integration of worker's compensation benefits with pension benefits to hold that ERISA permitted integration with worker's compensation benefits as well as Social Security and Railroad Retirement funds. The Court stated:

> Without speaking directly of its own rationale, Congress embraced such IRS rulings. See H.R.Conf.Rep. No. 93-1280, p. 277 (1974), 3 Leg.Hist. 4544 (approving existing antidiscrimination rules). Congress thereby permitted integration *along the lines already approved by the IRS....*

451 U.S. at 521, 101 S.Ct. at 1905. The Supreme Court applied tax rules and regulations regarding integration of multiple plans to ERISA, and in the opinion of this court, *Alessi* clearly defeats Burford's argument in this regard.

■ Burford next argues that the integration requirements only apply to tax qualified plans, and that its integration of benefits with Social Security in the service retirement plan is simply a method for calculation of benefits due. Burford cites *Alessi* for the proposition that ERISA "assures that an employee's claim to the protected benefit is legally enforceable, but it does not guarantee a particular amount or a method for calculating the benefit." 451 U.S. at 512. Burford is correct that the Treasury Regulations and Revenue Rulings concerning the integration of benefits in multiple plans refer to qualified plans. Nevertheless, in the opinion of this court, if Burford chose to avail itself of the advantages of integration, it should not now be allowed to object to its use of integration being governed by the rules and regula-

tions applicable to multiple plans. Furthermore, the profit-sharing plan is qualified for tax purposes, and all of the Internal Revenue provisions are obviously applicable to it. To say that Burford's failure to qualify one pension plan prevents the application of the tax laws relative to multiple plans to a second *qualified* pension plan would be senseless. In the opinion of this court, both the service retirement plan and the profit-sharing plan are governed by the Treasury Regulations and Revenue Rulings of the IRS.

■ The service retirement plan uses Social Security funds to offset retirement benefits due. § 7, Rev.Rul. 71–446, 1971–2 C.B. 187 addresses the integration of offset plans as follows:

> An offset plan is integrated if the rate at which the offset to any employee's benefit is computed does not exceed:
>
> .01 83⅓%, if the amount of the offset to an employee's benefit is computed on the basis of the Social Security Act as in effect at the time at which the offset is first applied.
>
> \* \* \* \* \* \*
>
> However, the dollar amount of the offset to any employee's benefit shall not be increased after the time at which the offset is first applied due to subsequent changes in the Social Security Act.

The service retirement plan offsets the amount due a Burford employee each month by 100% of the Social Security benefit he or she receives per month. As indicated above, the IRS only allows a plan to offset 83⅓% of a recipient's Social Security benefits; therefore, the level of integration in that plan is excessive.

Profit-sharing plans are addressed at § 15, Rev.Rul. 71–446, as follows:

> A profit-sharing or stock bonus excess plan is integrated only if:
>
> .01 The plan's integration level meets the requirements of section 6.01 or 6.04;
>
> .02 The rate at which employer contributions and forfeitures allocated to any participant in any year with respect to his actual compensation for such year in excess of the plan's integration level for

such year does not exceed 7% ..., except that a minimum allocation not exceeding $48 may be provided for each participant in any year that allocations are made;

> .03 The plan provides benefits only upon retirement, death, or other separation from service; and
>
> .04 All contributions are allocated on a nondiscriminatory basis when made.

The profit-sharing plan provided for contributions to individual participants' accounts of 7% of their compensation in excess of the Social Security taxable wage base. The maximum excess benefit allowed was 7% until 1984 when, pursuant to the Tax Reform Act of 1984, the maximum excess benefit allowed was amended to 5.7%. The plan's contribution level was reduced accordingly. The effect of the profit-sharing plan's integration with Social Security was that those employees whose salaries were below the taxable wage base received little or no benefits under that plan. It did not, however, utilize an excessive integration level.

Integration of multiple pension plans is addressed by § 17, Rev.Rul. 71–446, as follows:

> If an employer has more than one plan involving integration, and if any employee is or may be eligible to participate in more than one of such plans, such plans will be considered to be one plan and will be considered to be integrated if the extent of integration of all such plans does not exceed 100%. For purposes of the preceding sentence, the extent of integration of a plan is the ratio (expressed as a percentage) which the actual benefits, benefit rate, offset rate, or employer contribution rate under the plan bears to the limitation applicable to such plan.

In reviewing both plans as a whole, this court is of the opinion that if the service retirement plan alone integrates Social Security benefits at an impermissible level, then the level of integration of both plans together is necessarily also excessive. This court is further of the opinion, however, that the extent of Burford's violation of the integration rules cannot be resolved on summary judgment. For example, there is

insufficient data in the record presently before the court to allow it to determine which participants suffered from the excessive integration of the two plans. Additionally, Burford made no contribution to the profit-sharing plan in 1980, 1981, 1982, 1985, 1986, and 1987, and the impact of Burford's violation of the multiple plan integration rules would not be as great during those years. § 15, Rev.Rul. 71–446, is concerned with the amount of an employer's contribution allocated to a particular participant in any given year; a zero contribution cannot result in any allocation. It would also be inappropriate on summary judgment for the court to determine the extent to which Burford may offset future pensions due by the recipients' Social Security benefits.

G. Is the service retirement plan required to pay annuity benefits in the form of a "subsidized" joint and survivor annuity?

On August 24, 1984, ERISA and the Internal Revenue Code were amended by the enactment of the Retirement Equity Act of 1984, Pub.L. No. 98–397, 98 Stat. 1429 (1984) ("REA"). The provisions of REA pertinent to this issue are incorporated into ERISA at 29 U.S.C. § 1055, and are effective for all applicable employee benefit plan years commencing on January 1, 1985. Section 1055 provides that all ERISA pension plans must provide a joint and survivor annuity to the surviving spouse of each participant, unless the plan provides that, at the death of the participant, the participant's nonforfeitable accrued benefits are payable in full to the surviving spouse, or unless the surviving spouse specifically waives survivor benefits. Section 1055's provisions do not apply if there is no surviving spouse or if the surviving spouse signs a waiver, acknowledged by the plan administrator or a notary public, indicating his or her intention to waive those beneficiary rights. *See Donohue v. Shell Provident Fund*, 656 F.Supp. 905, 907 (S.D.Tex. 1987); *Binks Mfg. Co. v. Casaletto–Burns*, 657 F.Supp. 668, 670 (N.D.Ill.1986), *aff'd in part and dismissed in part*, 822 F.2d 1090 (7th Cir.1987) (no opinion). Although *Do-*

*nohue* and *Binks* discuss the enactment of REA, both involved plans which provided for the distribution of the participant's benefits in full to the surviving spouse at the participant's death, so they provide no further guidance to this court in the instant case.

Section 1055 provides, in pertinent part, as follows:

(a) **Required contents for applicable plans**

Each pension plan to which this section applies shall provide that—

(1) in the case of a vested participant who does not die before the annuity starting date, the accrued benefit payable to such participant shall be provided in the form of a qualified joint and survivor annuity, and

(2) in the case of a vested participant who dies before the annuity starting date and who has a surviving spouse, a qualified preretirement survivor annuity shall be provided to the surviving spouse of such participant.

\* \* \* \* \* \*

(c) **Plans meeting requirements of section**

(1) A plan meets the requirements of this section only if—

(A) under the plan, each participant—

(i) may elect at any time during the applicable election period to waive the qualified joint and survivor annuity form of benefit or the qualified preretirement survivor annuity form of benefit (or both), and

(ii) may revoke any such election at any time during the applicable election period, and

(B) the plan meets the requirements of paragraphs (2), (3), and (4).

(2) Each plan shall provide that an election under paragraph (1)(A)(i) shall not take effect unless—

(A) (i) the spouse of the participant consents in writing to such election, (ii) such election designates a beneficiary (or a form of benefits) which may not be changed without spousal consent (or the consent of the spouse expressly permits

designations by the participant without any requirement of further consent by the spouse), and (iii) the spouse's consent acknowledges the effect of such election and is witnessed by a plan representative or a notary public, or

(B) it is established to the satisfaction of a plan representative that the consent required under subparagraph (A) may not be obtained because there is no spouse, because the spouse cannot be located, or because of such other circumstances as the Secretary of the Treasury may by regulations prescribe.

Any consent by a spouse (or establishment that the consent of a spouse may not be obtained) under the preceding sentence shall be effective only with respect to such spouse.

\* \* \* \* \* \*

(5)(A) The requirements of this subsection shall not apply with respect to the qualified joint and survivor annuity form of benefit or the qualified preretirement survivor annuity form of benefit, as the case may be, if such benefit may not be waived (or another beneficiary selected) and if the plan fully subsidizes the costs of such benefit.

(B) For purposes of subparagraph (A), a plan fully subsidizes the costs of a benefit if under the plan the failure to waive such benefit by a participant would not result in a decrease in any plan benefits with respect to such participant and would not result in increased contributions from such participant.

\* \* \* \* \* \*

(7) For purposes of this subsection, the term "applicable election period" means—

(A) in the case of an election to waive the qualified joint and survivor annuity form of benefit, the 90–day period ending on the annuity starting date, or

(B) in the case of an election to waive the qualified preretirement survivor annuity, the period which begins on the first day of the plan year in which the participant attains age 35 and ends on the date of the participant's death.

In the case of a participant who is separated from service, the applicable election period under subparagraph (B) with respect to benefits accrued before the date of such separation from service shall not begin later than such date.

**(d) "Qualified and joint survivor annuity" defined**

For purposes of this section, the term "qualified joint and survivor annuity" means an annuity—

(1) for the life of the participant with a survivor annuity for the life of the spouse which is not less than 50 percent of (and is not greater than 100 percent of) the amount of the annuity which is payable during the joint lives of the participant and the spouse, and

(2) which is the actuarial equivalent of a single annuity for the life of the participant.

Such term also includes any annuity in a form having the effect of an annuity described in the preceding sentence.

The foregoing provisions are applicable to all Burford employees whose retirement was effective on or after January 1, 1985. Contrary to REA, Burford has made no provision for joint or survivor annuities, nor has it given any participant or spouse the opportunity to elect survivor benefits. The Burford employees contend that this conduct evidences an intent on Burford's part to provide fully subsidized survivor benefits. Burford argues that although it has not complied with ERISA in this regard, it should still be allowed to require participants to make the election contemplated by § 1055. Those participants and spouses who elect a joint and survivor benefit would then receive reduced present benefits in order to provide survivor pension benefits to the spouse at the participant's death.

This court is of the opinion that Burford is not required by ERISA to provide a fully subsidized joint and survivor annuity. Those participants who are not yet receiving benefits can easily make their elections to provide spousal survivor benefits at the time their pensions are scheduled to begin pursuant to § 1055(c)(7)(A). This court is

further of the opinion, however, that the participants who retired in 1985, 1986, and 1987 should not be penalized because of Burford's failure to comply with § 1055.[3] Congress intended that ERISA provide the courts with wide discretion in fashioning equitable relief that will rectify breaches of fiduciary duty, make plans whole, and protect the rights of beneficiaries. *See Donovan v. Bierwirth,* 754 F.2d 1049, 1055 (2d Cir.1985); *Eaves v. Penn,* 587 F.2d 453, 462 (10th Cir.1978); S.Rep. No. 93–127, 93rd Cong., 1st Sess., *reprinted in* 1974 U.S. Code Cong. & Admin.News 4838, 4871. In the opinion of this court, Burford should be required to allow these participants to elect reduced *future* benefits and a joint and survivor annuity, but in no event shall Burford be permitted to seek reimbursement for any past excess payments from those participants who choose to make such an election.

The Burford employees also argue that allowing Burford to institute an election procedure for spousal survivor benefits at this time violates the prohibition in 29 U.S.C. § 1054(g) against decreasing accrued benefits of a participant by a plan amendment which eliminates optional forms of benefits. Since this court is of the opinion that Burford did not promise and is not required to provide subsidized joint and survivor annuities, it is also of the opinion that § 1054(g) does not apply.

H. Is Burford's liability to provide benefits that may be awarded in this case limited to a trust fund funded to the limits required by the full funding limitation of ERISA, or is Burford liable for the present value of the accrued benefits promised pursuant to the service retirement plan?

■ Title 29 U.S.C. § 1102(b)(1) requires every pension benefit plan to "provide a procedure for establishing and carrying out a funding policy and method consistent with the objectives of the plan and the requirements of this subchapter." The Burford plan never met this requirement.

It merely paid those plan obligations which it chose to recognize from the general assets of Burford Equipment or Burford, Inc. Burford has not only taken the position that it has no obligation to fund promised benefits to employees who retired after the asset sale to Thompson Tractor, but also contends that it may choose to cease paying benefits at any time to those who retired before the sale. As the court has previously discussed, Burford's liabilities pursuant to the service retirement plan extend to all participants whose benefits have vested under the plan. Furthermore, Burford cannot now choose to withdraw benefits previously extended.

The court must now decide to what extent Burford must fund the plan which this court has determined that it established and maintained. Burford argues that ERISA does not require a plan to use a particular funding method, but allows it to choose a funding method from those acceptable under ERISA. The court agrees with this premise; the problem is that Burford never made a choice. Burford then states that the minimum funding requirements of Title I of ERISA do not require that an employer fully fund the present value of accrued benefits, and that it should only be required to set up a fund that consists of the value of the contributions it would have made to such a fund had it complied all along with the minimum funding requirements established by ERISA and discussed in 29 U.S.C. § 1082. The Burford employees argue that because the 1977 corporate resolution states that the service retirement plan benefits are "guaranteed," Burford should now be required to establish a trust with sufficient assets to pay the present value of all benefits promised to plan participants. The Burford employees also argue that 29 U.S.C. § 1085, which specifies an alternative minimum funding standard, is the more appropriate measure of liability in this case.

In essence, the Burford employees contend that it would be inequitable for this

---

**3.** Those participants retired after the effective date of REA and before Burford refused further benefits under the service retirement plan after the asset sale.

court to allow Burford to bypass the ERISA funding requirements for years and then, aided by 20/20 hindsight, choose the funding method which will most effectively minimize the costs to the company. Burford counters by contending that it would also be inequitable for the court to require it to utilize the funding method that would be the most expensive. As with many other questions presented in this case, this issue is complicated by Burford's total lack of compliance with ERISA. When this court balances the equitable considerations presented to it, however, the balance weighs heavily in favor of the employees.

This court has found the United States Court of Appeals for the District of Columbia Circuit's discussion of ERISA in *Rettig v. Pension Benefit Guar. Corp.*, 744 F.2d 133 (D.C.Cir.1984) helpful in its resolution of this issue. The *Rettig* court discussed the background of ERISA as follows:

A virtually unanimous Congress enacted ERISA in order to encourage the establishment and growth of private pension plans and to protect the participants in those plans by mandating the adoption of fair and equitable plan provisions for vesting the participation, by requiring adequate funding, prudent financial management and full disclosure, and by creating a system of plan termination insurance administered by a new government agency, the PBGC....

> \* \* \* \* \* \*

Vesting and other plan improvements required by ERISA were not adequate, however, to protect participants in plans that terminated with insufficient funds to cover vested benefits. Throughout the deliberations that culminated in the enactment of ERISA, Congress was inundated with tragic stories of pension plan failures in which thousands of employees saw the destruction of the small measure of retirement security they had built up through decades of forced savings and deferred compensation. Congress responded to this recurring tragedy by passing, as a major feature of comprehensive pension reform, a program of plan termination insurance. Under Title IV of ERISA, repeatedly hailed by legislators as one of the linchpins of the Act, the newly-created PBGC would guarantee the payment of non-forfeitable (or vested) benefits—up to a statutorily-prescribed maximum monthly amount.

744 F.2d at 135–37 (footnotes omitted). Not the least of Burford's omissions here is its failure to participate in the plan termination insurance program established by ERISA. When the service retirement plan terminated without sufficient funds to satisfy all of its liabilities, if Burford had set up a trust fund that complied with ERISA and availed itself of termination insurance, the plan participants would have had recourse to the Pension Benefit Guaranty Corporation to rectify the shortfall. They do not have that recourse; therefore, this court must look solely to Burford in its efforts to fashion a remedy that will make the service retirement plan whole.

*Rettig* considered an amendment to ERISA passed by Congress in 1980 which reinforced its intention that pension plan participants should be guaranteed those benefits for which they had worked over the years.

Prior to 1980, participants in plans that terminated without being amended to comply with Title I were not guaranteed benefits because the PBGC read section 4022(a) of ERISA, which provided only for the guarantee of benefits that were "nonforfeitable ... under the terms of the plan," to preclude the guarantee of those benefits. Notice of the PBGC's failure to guarantee benefits required to be vested under Title I was met with apparent surprise in Congress—surprise either at the PBGC's construction of ERISA or at the fact that many plans ... had failed to amend in conformity with ERISA. In 1980, Congress therefore amended section 4022(a) to delete the phrase "under the terms of the plan" and added a definition of "nonforfeitable benefits" guaranteeable under section 4022(a) as those "for which a participant has satisfied the conditions for entitlement under the plan *or the requirements of this Act.* Multiemployer Pension Plan Amendments Act of 1980,

§ 402(a)(1)(E), 29 U.S.C. § 1301(a)(8) (emphasis added)....

... Senator Williams, who had been a key sponsor of ERISA, explained to his colleagues the need for the amendment:

> It has been brought to our attention that a significant number of pension plans—perhaps as many as 25,000—have never been amended to conform with the requirements of title I of ERISA. This is particularly disturbing because title I contains a number of requirements relating to minimum vesting and participation standards, mandatory joint and survivor annuities, and so forth, that provide crucial protection to plan participants.
>
> Under current law, the PBGC guarantees pension benefits that are nonforfeitable under the plan. As a result, if a plan administrator ... has not amended a plan to comply with ERISA, the PBGC is unable to guarantee the benefits to which a participant is entitled under the standards established by title I of ERISA. In effect, innocent participants are paying the price when their employers disregarded the law.
>
> We believe that when a nonamended plan terminates, the PBGC should guarantee those benefits to which the participant would have been entitled if the plan had conformed to the essential requirements of title I, subtitle B, part 2. Accordingly, the bill amends current law to delete the requirement that the PBGC may only guarantee benefits that are nonforfeitable under the terms of the plan. Under the bill, the PBGC has authority to guarantee benefits for which the participants have satisfied the appropriate requirements of title I of ERISA....

126 Cong.Rec. 23288 (1980).

*Rettig,* 744 F.2d at 147–48 (footnotes omitted).

The scenario presented to the court in this case is exactly what ERISA was designed to prevent—the abrupt loss of promised benefits to plan participants after years of employment. Burford was not obligated to establish the service retirement plan, but once it did, it was obligated to comply with ERISA. It made no attempt whatsoever to do so. This court is of the opinion that the Burford employees should not pay the price for Burford's disregard of the law. Because ERISA does not mandate any particular funding standard, this court can see no reason why Burford should not be required to establish a trust funded to the extent of the present value of the benefits promised to the Burford employees for which they have satisfied any conditions for entitlement.

Particularly compelling to this court is *Rettig*'s discussion of the remedial nature of ERISA. The court stated:

> [T]his statute was passed with the overwhelming purpose of protecting the legitimate expectations harbored by millions of employees of a measure of retirement security at the end of many years of dedicated service. The other statutory purposes—encouraging the growth of private pension plans and keeping down the costs of termination insurance for those plans—are important but necessarily secondary: those purposes have meaning only in light of the need for a fair and reliable system of retirement income security for employees.
>
> The time-worn canon of statutory construction that requires the generous construction of remedial statutes is only a guideline that must of course give way to clear contrary legislative intent or to concrete and well-grounded policy considerations. But we have here a question of statutory construction in which the more generous reading, although not necessitated by the specific language and legislative history, is supported by the preponderance of evidence of specific congressional intent and by the compelling interests of the intended beneficiaries of this statutory scheme, which is animated throughout by a generous remedial purpose.

*Rettig,* 744 F.2d at 155. The court further elaborated on the importance of ERISA's remedial intent as follows:

One principle of statutory construction teaches, of course, that remedial statutes are to be liberally construed to effectuate their purposes. *See Tcherepnin v. Knight,* 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *International Union, U.A.W. v. Marshall,* 584 F.2d 390, 396 (D.C.Cir.1978). There can be no doubt that ERISA, and in particular its provision for termination insurance under Title IV, is a remedial statute.... The PBGC itself has successfully argued in other cases that "coverage under [ERISA] should be liberally construed to provide the maximum degree of protection to working men and women ... [while] exemptions should be confined to their narrow purpose." *Connolly v. PBGC,* 581 F.2d 729, 732 (9th Cir.1978) (quoting S.Rep. No. 127, 93d Cong., 1st Sess. 18 (1973)), *cert. denied,* 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979). *See also A–T–O, Inc. v. PBGC,* 634 F.2d 1013, 1020 (6th Cir.1980) (ERISA should be interpreted to "protect employees' expectations in their vested pension benefits"). Although the principle that remedial legislation is to be generously construed obviously "does not give the judiciary license, in interpreting a provision, to disregard entirely the plain meaning of the words used by Congress," *Belland v. PBGC,* 726 F.2d [839] at 844 [ (D.C.Cir.1984) ] (quoting *Symons v. Chrysler Corp.,* 670 F.2d 238, 241 (D.C. Cir.1981)), the overwhelming evidence of the remedial purpose of ERISA must be given due weight in construing provisions whose language and specific legislative history are susceptible of varying interpretations.

*Rettig,* 744 F.2d at 155 n. 54.

To allow Burford to limit its liability in this case by inadequately funding a trust to provide the benefits legitimately expected by its former employees would frustrate the purpose of ERISA. This court cannot and should not allow such a result. In the opinion of this court, the remedial nature of ERISA permits this court to fashion a remedy in this case to provide the maximum degree of protection allowed by law for the Burford employees. Burford will be com-

pelled, therefore, to establish a trust that is adequately funded to satisfy the Burford employees' expectations in their vested pension benefits. This court agrees with the Burford employees that the minimum funding standard set forth in 29 U.S.C. § 1085 is an appropriate formula to utilize in calculating the amount necessary to fund the trust in accordance with this court's instructions.

## I. Does Burford have a cause of action pursuant to ERISA against Parmer?

■ As the court has noted above, Burford has filed a third-party complaint against Parmer seeking indemnification. Burford argues, in essence, that because Parmer was on the board of directors, he was a fiduciary of the plan and should be liable as a co-fiduciary.

Parmer contends that he was not a fiduciary of the service retirement plan. Whether a member of a board of directors is a fiduciary of an ERISA pension plan is addressed at 29 C.F.R. § 2509.75–8 as follows:

D–4 Q: In the case of a plan established and maintained by an employer, are members of the board of directors of the employer fiduciaries with respect to the plan?

A: Members of the board of directors of an employer which maintains an employee benefit plan will be fiduciaries only to the extent that they have responsibility for the functions described in section 3(21)(A) of the Act.

Title 29 U.S.C. § 1002(21)(A) [ERISA section 3(21)(A) ] states:

[A] person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary

authority or discretionary responsibility in the administration of such plan.

Upon reviewing the evidence presented in this case, this court finds no indication that Parmer, or any other director, had any authority, control, or responsibility whatsoever for the service retirement plan. Lamar Burford's testimony clearly demonstrates that he was the only person at Burford Equipment who had responsibility for the functions described in § 1002(21)(A) above. Parmer was not, therefore, a fiduciary of the service retirement plan, and is entitled to dismissal of the third-party complaint against him.

██ Even if Parmer were a fiduciary, however, this court is of the opinion that ERISA does not provide any right of indemnification or contribution. *See Massachusetts Mutual,* 473 U.S. at 147, 105 S.Ct. at 3092. The ERISA provisions which address liability among co-fiduciaries address only their liability to the plan itself. This court finds the reasoning of the United States District Court for the Eastern District of North Carolina in *Brock v. Gillikin,* 677 F.Supp. 398 (E.D.N.C.1987) regarding liability of co-fiduciaries to each other to be persuasive.

> There are no specific provisions within ERISA providing a right of indemnification or contribution among fiduciaries. Rather, the statute specifically addresses the liability of a fiduciary to "the plan". ERISA § 409, 29 U.S.C. § 1109. A right to indemnification under ERISA has been allowed rarely and then only in narrowly defined situations. *See Donovan v. Robbins,* 752 F.2d 1170 (7th Cir.1984); *Free v. Briody,* 732 F.2d 1331 (7th Cir.1984) (both cases involved recovery for the passive fiduciary against the active wrongdoer).
>
> In *Massachusetts Mutual Life Insurance Co. v. Russell,* 473 U.S. 134, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), the court refused to read a damage claim [of a plan participant/beneficiary against a plan fiduciary] into ERISA, noting that a comprehensive legislative scheme, such as ERISA, suggests that omissions regarding remedies should be presumed de-

> liberate. This court doubts that any claim for indemnification or contribution should be read into ERISA.

677 F.Supp. at 402–03. The Eleventh Circuit has also refused to find an implied cause of action in ERISA where no such intent was specifically expressed by Congress. *Dime Coal Co. v. Combs,* 796 F.2d 394 (11th Cir.1986) (holding that employers are not authorized to file civil actions under ERISA).

Because the court is of the opinion that Parmer was not a fiduciary and that ERISA does not provide for indemnification among co-fiduciaries, the remaining arguments he raises need not be addressed.

## IV. CONCLUSION

For the reasons heretofore set forth in this memorandum opinion, it is the opinion of this court that (1) the service retirement plan is a "benefit plan" as defined by ERISA; (2) the service retirement plan is not a "top-hat plan"; (3) the Burford employees' claims are not barred by ERISA's statute of limitations; and (4) Burford's liability to provide benefits pursuant to the service retirement plan shall be calculated on the basis of the present value of the accrued benefits promised to the Burford employees. Accordingly, the Burford employees' motions for partial summary judgment are due to be granted in those respects.

It is further the opinion of this court that (1) Burford is allowed by law to integrate Social Security benefits with pension benefits and (2) Burford is not obligated to provide a subsidized joint and survivor annuity. Accordingly, Burford's motion for partial summary judgment is due to be granted in those respects. The Burford employees' motions for partial summary judgment are due to be denied as moot concerning those issues. Burford's motion for summary judgment as to the extent of integration which is permissible in multiple benefit plans is due to be denied, however, since factual issues exist which must be resolved at trial.

It is further the opinion of this court that (1) ERISA does not require the service

retirement plan to be qualified by the IRS for tax purposes and (2) the normal retirement age under the service retirement plan is 62. Accordingly, Burford's motion for partial summary judgment is due to be granted in those respects. The court is also of the opinion, however, that the service retirement plan offered early retirement at age 55, and that it must continue to provide this optional benefit.

Finally, this court is of the opinion that Parmer was not a fiduciary of the service retirement plan. Accordingly, Parmer's motion for summary judgment is due to be granted, and the third-party complaint against him is due to be dismissed with prejudice.